# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **AIRADIGM COMMUNICATIONS, INC.,** | ) | **Case No. 06-10930** |
| | ) | |
| **Debtor.** | ) | |

### AMENDED DISCLOSURE STATEMENT OF AIRADIGM COMMUNICATIONS, INC. AS OF JUNE 13, 2006

GOLDBERG, KOHN, BELL, BLACK,
  ROSENBLOOM & MORITZ, LTD.
Ronald Barliant
Alan P. Solow
Kathryn A. Pamenter
55 East Monroe Street
Suite 3700
Chicago, Illinois  60603
Telephone: (312) 201-4000
Facsimile: (312) 332-2196

Attorneys for the Debtor and Debtor-in-Possession

_____

THIS DISCLOSURE STATEMENT IS SUBMITTED FOR DETERMINATION BY THE COURT REGARDING WHETHER IT CONTAINS ADEQUATE INFORMATION AS REQUIRED BY 11 U.S.C. § 1125. SUCH DETERMINATION, HOWEVER, WILL NOT CONSTITUTE THE COURT'S RECOMMENDATION OR APPROVAL OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN AND YOU SHOULD REACH YOUR OWN CONCLUSION ABOUT HOW TO VOTE ON THAT PLAN.

THE COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT FOR CIRCULATION TO CREDITORS AND INTERESTHOLDERS OR FOR USE IN THE SOLICITATION OF VOTES ON THE PLAN DESCRIBED HEREIN. THE DEBTOR WILL REQUEST (A) AUTHORITY FROM THE COURT TO MAIL A COPY OF THIS DISCLOSURE STATEMENT TO CREDITORS AND INTEREST HOLDERS, WITHOUT APPROVAL OF ITS TERMS AND SUBJECT TO A FUTURE DETERMINATION OF THE ADEQUACY OF THE INFORMATION CONTAINED THEREIN AND (B) TO HOLD A COMBINED HEARING ON APPROVAL OF THIS DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN. THIS DISCLOSURE STATEMENT IS SUBJECT TO MODIFICATION AS REQUIRED BY THE COURT. TO THE EXTENT THE COURT APPROVES THE DISCLOSURE STATEMENT IT WILL NOT CONSTITUTE A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN, OR AN ENDORSEMENT OF THE MERITS OF THE 2006 PLAN.

# TABLE OF CONTENTS

EXECUTIVE SUMMARY AND RECOMMENDATION .......................................................1

I.   INTRODUCTION ...............................................................................................................2

     A.   General. ....................................................................................................................2
     B.   Overview of the 2006 Plan. .....................................................................................2
     C.   Recommendation. .....................................................................................................9
     D.   Disclaimers. ..............................................................................................................9
     E.   Voting Instructions and Procedures. ......................................................................10
     F.   Hearing on Confirmation of the 2006 Plan. ...........................................................10

II.  BACKGROUND AND EVENTS LEADING TO CHAPTER 11
     CASE ................................................................................................................................11

     A.   History of Debtor. ...................................................................................................11
     B.   The Prior Chapter 11 Bankruptcy Case. .................................................................12
     C.   Events Leading to This Bankruptcy Filing. ............................................................13

III. SUMMARY OF THE 2006 PLAN OF REORGANIZATION ....................................14

     A.   Description of the 2006 Plan. .................................................................................14
     B.   Classification of Claims and Interests. ...................................................................15
     C.   Treatment of Unclassified Claims. .........................................................................16
     D.   Treatment of Classified Claims. .............................................................................16
     E.   Means of Implementation. ......................................................................................19
     F.   Executory Contracts and Unexpired Leases. ..........................................................20
     G.   Retention of Jurisdiction. .......................................................................................20
     H.   Release of Claims and Miscellaneous Provisions. .................................................20

IV.  INSIDER TRANSACTIONS ...........................................................................................21

V.   PROJECTIONS .................................................................................................................21

VI.  SELECTED CODE REQUIREMENTS ...........................................................................22

     A.   Best Interest Test. ...................................................................................................22
     B.   Feasibility and Administrative Expense Claims. ....................................................22

VII. FEDERAL INCOME TAX CONSEQUENCES ..............................................................23

     A.   Tax Consequences to Creditors. .............................................................................24

B.     Tax Consequences to the Debtor. ...........................................................................24

VIII.   RISK FACTORS ........................................................................................................24

A.     Confirmation of the 2006 Plan. ............................................................................24
B.     Disputed Claims. ..................................................................................................25
C.     Conditional Nature of the 2006 Plan. ...................................................................25

IX.    MISCELLANEOUS PROVISIONS...........................................................................25

A.     Binding Effect of the 2006 Plan. ..........................................................................25
B.     Withdrawal or Revocation of the 2006 Plan. ........................................................26
C.     Modification of the 2006 Plan. .............................................................................26
D.     Governing Law. ....................................................................................................26

X.     CONCLUSION AND RECOMMENDATION.............................................................27

# EXECUTIVE SUMMARY

Airadigm Communications, Inc. ("Airadigm" or the "Debtor")[1] filed for relief under chapter 11 of the Code in this Court in 1999. Shortly thereafter, the FCC asserted that Airadigm's Licenses had been automatically canceled due to the filing of the 1999 case. Airadigm moved to reinstate the Licenses. In 2000, the Court confirmed a plan of reorganization that provided for the sale of Airadigm's assets, including its Licenses, to TDS and Telecorp Communications Corp. ("Telecorp").[2] The proceeds of those sales would have been sufficient to pay in full all claims of creditors in the 1999 case, including the FCC, and to make a distribution to the owners of the Equity Interests. Airadigm could not complete the sale of its assets, however, because the FCC did not rule on Airadigm's motion to reinstate the Licenses until 2003, when it determined that the Licenses were never canceled and declared Airadigm's motion to the FCC for reinstatement of the Licenses moot. In the nearly three-year period between the confirmation of the 2000 Plan and the FCC's decision as to the Licenses, the obligations of TDS and Telecorp to purchase Airadigm's assets expired, and the value of the Licenses fell dramatically. The FCC's actions and delay therefore made it impossible to implement the 2000 Plan.

Because of the decline in value of the Licenses, Airadigm filed this new chapter 11 case. Airadigm owes the FCC about $64,000,000 for the balance of the purchase price of the Licenses; its indebtedness to TDS is approximately $136,000,000. Airadigm cannot pay those debts in accordance with their terms. Further, Airadigm's value as a going concern is far less than the indebtedness, so Airadigm cannot refinance its debt. Should Airadigm default on its debt to the FCC, it will lose the Licenses and will be unable to continue as a going concern. Airadigm currently is not servicing its secured debt, and accordingly, has a sufficient amount of cash for its day-to-day operations. Airadigm's operations are constrained by its cash flow; however, Airadigm has been operating on a cash available basis since 1999. If the FCC has a perfected Lien on the Licenses and the debt to the FCC were reduced to the value of the Licenses, Airadigm expects to be able to obtain the financing needed to pay that debt from TDS. Moreover, on the conditions set forth below and in the 2006 Plan, TDS has indicated that it is willing to restructure its Claim. Airadigm has therefore filed this case and proposed the 2006 Plan as a means to restructure its debt to the FCC and its secured debt.

Airadigm may seek to have the Court avoid the FCC's Lien, and if the Court does so, the FCC would be treated as an unsecured creditor. Otherwise, the 2006 Plan provides that Airadigm will pay the FCC the full value of those Licenses or portions of Licenses that Airadigm elects to retain. Airadigm will return all of the other Licenses or portions thereof to the FCC. Those payments and returns will satisfy the FCC Secured Claims, if any. The Secured Claim of TDS will be paid on terms agreed to by TDS. All existing common stock

---

[1]   All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan of Reorganization For Airadigm Communications, Inc. as of May 8, 2006 (as it may be amended or modified from time to time, the "2006 Plan"), a copy of which is attached hereto as Exhibit A.

[2]   Telecorp was subsequently acquired by AT&T Wireless Services, Inc., which was in turn acquired by Cingular Wireless LLC.

in Airadigm will be canceled, and new stock will be issued to the FCC and TDS in satisfaction of the amount of their Claims in excess of the value of their collateral. Funding of the 2006 Plan will be from Airadigm's cash on hand and, to the extent necessary, loans expected to be made by TDS.

Airadigm will pay all unsecured Allowed Claims of $10,000 or less (or that the holder elects to reduce to that amount) in full, without interest. All other unsecured creditors (including the FCC and TDS, to the extent their Claims are unsecured) will receive common stock in the Reorganized Debtor.

As a creditor of Airadigm, you may have the right to vote to accept or reject the 2006 Plan. Because the 2006 Plan will allow Airadigm to continue in business, while satisfying all existing Claims, Airadigm believes that the 2006 Plan represents the best available alternative for holders of Allowed Claims. As more fully set forth in Section I.F herein, on July 27, 2006, the Court will be holding a combined hearing on the approval of this Disclosure Statement and confirmation of the 2006 Plan. Objections to the adequacy of this Disclosure Statement and to confirmation are due on July 25, 2006, except that objections of the FCC are due July 17, 2006. The deadline for voting to accept or reject the 2006 Plan is July 25, 2006. If you are entitled to vote under the Code, you will receive a ballot for voting purposes. Airadigm urges you to read this Disclosure Statement and the 2006 Plan in full and then to vote to accept the 2006 Plan.

## I.    INTRODUCTION

### A.    General.

Airadigm submits this Disclosure Statement for use in the solicitation of votes to accept the 2006 Plan. This Disclosure Statement is being transmitted to all known holders of Claims against or Equity Interests in the Debtor in order to disclose information deemed to be material, important and necessary for creditors of the Debtor to make an informed decision in exercising their right to vote to accept or reject the 2006 Plan.

### B.    Overview of the 2006 Plan.

The 2006 Plan is summarized at Article III below, and a copy of the 2006 Plan is attached as Exhibit A. You are urged to read this entire Disclosure Statement and the 2006 Plan before casting your ballot. The following chart, however, is offered as a guide with respect to the designation and treatment of Claims and Equity Interests under the 2006 Plan:

| Class | Est. Claim Amt. | 2006 Plan Treatment | Recovery as a % of Claim |
|---|---|---|---|
| 1 (Priority Claims) | $164,000 | Class 1 Claims are **unimpaired**.  On the Effective Date, the Reorganized Debtor will pay the holder of each Allowed Class 1 Claim the full amount of such Claim in cash, unless the Reorganized Debtor, TDS and such holder otherwise agree.  Any Class 1 Claims that are not Allowed Claims on the Effective Date will be paid on the Payment Date, unless the Reorganized Debtor, TDS and such holder otherwise agree. | 100% |

| Class | Est. Claim Amt. | 2006 Plan Treatment | Recovery as a % of Claim |
|---|---|---|---|
| 2 (FCC Claims to the Extent They are Secured Claims) | $26,400,000 | Each Class 2 Claim is **impaired**.  Each Class 2 Claim of the FCC shall be allowed as a Secured Claim in the amount determined by the Court and all such claims will be satisfied in full as follows: | 100% |
|  |  | **First,** the Reorganized Debtor will determine no later than the eleventh day after the Confirmation Date which Licenses or Partial Licenses it elects to retain and which it elects to surrender;  provided that any such election is subject to the approval of TDS.    All Licenses and Partial Licenses will either be paid or surrendered as further described below. |  |

| Class | Est. Claim Amt. | 2006 Plan Treatment | Recovery as a % of Claim |
|---|---|---|---|
| 2 (FCC Secured Claim) (continued) | | **Second,** with respect to each License that the Reorganized Debtor elects to retain, it will pay the holder of the Class 2 Claim secured by that License the full amount of that Secured Claim, without interest (except as provided in Code § 506(b)), in cash on the Payment Date, less a credit for the full amount of payments made by the Debtor on account of the License before the Petition Date. | |
| | | **Third,** with respect to each Partial License that the Reorganized Debtor elects to retain, it will pay the holder of the Class 2 Claim secured by the License from which the Partial License was Partitioned or Disaggregated an amount equal to the Retained Pro Rata Portion of that Claim, without interest (except as provided in Code § 506(b)), in cash on the Payment Date, less a credit for the full amount of payments made by the Debtor on account of the License before the Petition Date. | |

| Class | Est. Claim Amt. | 2006 Plan Treatment | Recovery as a % of Claim |
|---|---|---|---|
| 2 (FCC Secured Claim) (continued) | | **Fourth,** with respect to each License that the Reorganized Debtor elects to surrender, the Reorganized Debtor will surrender that License on the Payment Date to the holder of the Class 2 Claim secured by that License and shall receive a credit against any Claim held by such holder in an amount equal to the greater of: (a) the current market value of the License as determined by the Court, or (b) the net original bid price for such License, plus the amount of any other payments made by the Debtor on account of the License before the Petition Date. | |
| | | **Fifth,** with respect to each Partial License that the Reorganized Debtor elects to surrender, the Reorganized Debtor will surrender that Partial License on the Payment Date to the holder of the Class 2 Claim secured by the License from which the Partial License was Partitioned or Disaggregated and shall receive a credit against any Claim held by such holder in an amount equal to the Surrendered Pro Rata Portion of the greater of either (a) the current market value of the License as determined by the Court, or (b) the net original bid price for such License. | |

| Class | Est. Claim Amt. | 2006 Plan Treatment | Recovery as a % of Claim |
|---|---|---|---|
| 2 (FCC Secured Claim) (continued) | | Upon satisfaction of the Class 2 Claims in accordance with the foregoing, the Liens in the Licenses securing such Claims will be released, and the Reorganized Debtor will own any Licenses or Partial Licenses that it has retained free and clear of all liens, claims or encumbrances. | |
| | | If the holder of a Class 2 Claim makes the election described in § 1111(b) of the Code, then (i) it will retain its Lien to the extent of the allowed amount of the Secured Claim, and (ii) the Reorganized Debtor will satisfy the Secured Claim with respect to which such election is made by investing the cash amount that would otherwise be payable (if no § 1111(b) election had been made) under section (a) of this Article, to purchase, for the benefit of such holder, either, at the election of the Reorganized Debtor, (x) a security representing either an obligation of the United States or an obligation guaranteed by an agency of the United States and backed by the full faith and credit of the United States, or (y) an annuity contract issued by an insurance company having an "A" rating or better from A.M. Best Company or Standard & Poor's. The terms of such security or annuity shall be such that the FCC will receive, in no more than 30 years, deferred cash payments totaling at least the full amount of its Secured Claim, of a value, as of the Effective Date, of the License or Partial License that secures such Secured Claim. | |

| Class | Est. Claim Amt. | 2006 Plan Treatment | Recovery as a % of Claim |
|---|---|---|---|
| 3 (TDS Secured Claims) | To be determined | 1. Each Class 3 Claim is **impaired**. TDS, the holder of the Class 3 Claims, will retain its Liens until such Claims are satisfied in full, at which time such Liens will be released. The Reorganized Debtor will satisfy the Class 3 Claims in full as follows: | 100% |
| | | 2. The Class 3 Claims will bear interest on the Allowed amount of such Claims from and after the Effective Date at the rate of 10% per annum (or such other rate as the Debtor and TDS may agree before the Confirmation Date). For the first three (3) years after the Effective Date, the Reorganized Debtor will pay only accrued interest in semi-annual payments, making the first such payment on the first day of the sixth month following the month in which the Effective Date occurs and each of the next five (5) interest payments on the first day of each sixth month thereafter. Beginning on the first day of the forty-second month after the month in which the Effective Date occurs, the Allowed amount of the Class 3 Claims will be amortized over a term of eighty-four (84) months thereafter, and the Reorganized Debtor will make equal semi-annual installment payments of principal plus accrued interest, with a balloon payment on the first day of the one-hundred-second month after the month in which the Effective Date occurs, of the entire unpaid balance of principal and accrued interest. | |

| Class | Est. Claim Amt. | 2006 Plan Treatment | Recovery as a % of Claim |
|---|---|---|---|
| 4 (Miscellaneous Secured Claims) | The Debtor does not know of any such Claims | Class 4 Claims are **unimpaired**.  On the Effective Date, the Reorganized Debtor, in its discretion, shall either:  (i) pay in cash the balance due and owing on each Allowed Class 4 Claim, or (ii) surrender the collateral securing the Claim to the holder of the Allowed Class 4 Claim, in full and complete satisfaction of said Class 4 Claim.    Holders of Allowed Class 4 Claims shall retain their Liens until such payment or surrender. | 100% |

| Class | Est. Claim Amt. | 2006 Plan Treatment | Recovery as a % of Claim |
|---|---|---|---|
| 5 (Unsecured Claims) | $130,000,000 | Class 5 Claims are **impaired**.    Holders of Class 5 Claims will receive common shares of voting stock in the Reorganized Debtor on the Effective Date.    The Reorganized Debtor will issue one common share for each $500,000 of the Allowed Class 5 Claims in full satisfaction of such Claims. | To be satisfied by issuance of Equity Interests |

| Class | Est. Claim Amt. | 2006 Plan Treatment | Recovery as a % of Claim |
|---|---|---|---|
| 6 (Convenience Claims) | $60,000 | Class 6 Claims are **impaired**.  On the Effective Date, the Reorganized Debtor will pay, in cash, the full amount of each Allowed Class 6 Claim, without interest. | 100% |

| Class | | 2006 Plan Treatment | Recovery as a % of Claim |
|---|---|---|---|
| 7 (Equity Interests) | | Class 7 Interests are **impaired**.  On the Effective Date, all Equity Interests will be canceled. | 0% |

C.    Recommendation.

The 2006 Plan provides for the restructuring of the FCC and TDS indebtedness, and for the payment of all unsecured Claims of $10,000 or less in full.  Without the restructuring, Airadigm would be unable to make payments to the FCC and TDS, resulting in the loss of its Licenses and other assets and its inability to continue as a going concern.  In any liquidation, the FCC and TDS, as the senior secured creditors with liens on all assets, would be entitled to payment before any other creditor.  Since TDS has a Lien on the proceeds of the Licenses, even the avoidance of the FCC's Lien would not benefit unsecured creditors. Because Airadigm does not have enough assets to satisfy either the FCC's $64,219,424 Claim or TDS' $136,652,535 Claim, unsecured creditors would receive nothing in liquidation.  On the other hand, if the 2006 Plan is confirmed, Airadigm will continue to operate and is expected to be a profitable enterprise that will continue to provide service to its customers and to pay its employees, suppliers, roaming partners, lessors and all other creditors in full in the ordinary course of business.  Accordingly, Airadigm urges all creditors entitled to vote to accept the 2006 Plan.

D.    Disclaimers.

The Debtor is seeking an order of the Court approving this Disclosure Statement as containing adequate information, that is, information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, to enable a hypothetical reasonable investor typical of holders of Claims against the Debtor to make an informed judgment as to whether to accept or reject the 2006 Plan.  The hearing on such motion will not be held until July 27, 2006. **The Court's approval of this Disclosure Statement will constitute neither a guaranty of the accuracy or completeness of the information contained herein, nor an endorsement of the merits of the 2006 Plan.**

This Disclosure Statement contains information that may bear upon your decision to accept or reject the 2006 Plan.  Please read this document thoroughly and carefully.

This Disclosure Statement has been prepared in accordance with Code § 1125 and Bankruptcy Rule 3016(c) and not necessarily in accordance with any federal or state securities laws, "blue sky" laws or other applicable laws.  This Disclosure Statement has not been filed with, or reviewed by, the Securities and Exchange Commission ("SEC") or any securities regulatory authority of any state.  The 2006 Plan has not been approved or disapproved by the SEC or any state securities commission, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein.  Any representation to the contrary is a criminal offense.

For the convenience of creditors, this Disclosure Statement summarizes the terms of the 2006 Plan, but the 2006 Plan itself qualifies any summary.  This Disclosure Statement contains information supplementary to the 2006 Plan and is not intended to supplant or substitute for the 2006 Plan itself.  **If any inconsistency exists between the 2006 Plan and this Disclosure Statement, then the terms of the 2006 Plan control.**

This Disclosure Statement is the only document authorized by the Court to be used in connection with the solicitation of votes on the 2006 Plan. Neither the Court nor the Debtor has authorized any person to use or disclose any information concerning the Debtor other than the information contained herein. In arriving at your decision to approve or reject the 2006 Plan, you should not rely upon any representations or inducements made to secure your vote which are either in addition to or in contradiction of those contained herein.

Other than as explicitly set forth herein, creditors should not rely upon any information relating to the Debtor, its estate, the value of its assets or the nature of its liabilities. The Debtor has provided all financial information contained herein, and such information has not been the subject of a certified audit.

The contents of this Disclosure Statement should not be construed as legal, business, securities or tax advice. **Each creditor is encouraged to consult its own legal counsel and accountant as to legal, tax and other matters concerning its claim or its treatment under the 2006 Plan.**

      E.     <u>Voting Instructions and Procedures.</u>

On May 15, 2006, the Court entered an order (the "Bar Date Order") establishing July 6, 2006 as the last date for creditors to file proofs of claim. Pursuant to Bankruptcy Rules 3002(c)(1) and 3003(c)(3), governmental units (including the FCC) have until 180 days after the Petition Date to file proofs of claim.

On or about May 15, 2006, the Debtor served a Notice of the Bar Date Order on all known creditors.

Under Code § 1126, only holders of Claims that are impaired (as defined in Code § 1124) are entitled to vote to accept or reject a plan. In this Case, only holders of Claims in Classes 2 (FCC Secured Claims), 3 (TDS Secured Claims), 5 (Unsecured Claims) and 6 (Convenience Claims), as described in the 2006 Plan, are impaired and entitled to vote to accept or reject the 2006 Plan. Holders of Equity Interests in Class 7 are impaired but are not entitled to vote on the 2006 Plan because they are not receiving or retaining any property under the 2006 Plan. Class 7 is deemed to reject the 2006 Plan. The holders of Claims in Classes 1 (Priority Claims) and 4 (Miscellaneous Secured Claims) are not impaired, and those Classes are deemed to accept the 2006 Plan.

      F.     <u>Hearing on Confirmation of the 2006 Plan.</u>

The Court has scheduled a confirmation hearing for July 27, 2006 (the "Confirmation Hearing"). At the Confirmation Hearing, the Court may, if sufficient acceptances of the 2006 Plan are received and the statutory requirements met, enter an order confirming the 2006 Plan. Objections to confirmation must be filed and served by July 25, 2006, except that objections by the FCC must be filed and served by July 17, 2006.

## II.    BACKGROUND AND EVENTS LEADING TO CHAPTER 11 CASE

A.    History of Debtor.

Airadigm was incorporated as Wireless PCS in early 1995 by the principals of Wisconsin Wireless Communications Corporation ("WWCC"), headquartered in Little Chute, Wisconsin. Shortly after Airadigm was formed, the Oneida Enterprise Development Authority ("OEDA") acquired 49.9% of the Equity Interests in the Debtor; WWCC retained 50.1%.

Airadigm was formed to take advantage of 1993 federal legislation setting aside portions of radio bandwidth for new technologies in wireless communications. Licenses to use specific portions of the radio bandwidth, designated as the C-block and F-block, were reserved for smaller businesses such as Airadigm, referred to as "designated entities." In May 1996, Airadigm acquired thirteen C-block personal communications services ("PCS") Licenses in an auction by the FCC. In a later auction, the company acquired two F-block Licenses. As a result, Airadigm acquired a total of fifteen Licenses in defined geographic areas known as Basic Trading Areas ("BTAs") covering a contiguous population of 3.5 million in Wisconsin, Michigan, Minnesota and northeastern Iowa. Airadigm financed the purchase of the Licenses through the FCC's installment payment program, incurring a debt of approximately $64 million to the FCC.

On March 17, 1997, Airadigm became the first non-pioneer's preference[3] C-block licensee in the country to launch commercial service. Its first service territory was in the Appleton-Oshkosh BTA. It now offers service in 14 more BTAs: Eau Claire, Green Bay, Madison, Fond du Lac, La Crosse, Sheboygan, Marinette, Manitowoc, Stevens Point-Wisconsin Rapids, Wausau-Rhinelander, and Janesville-Beloit (Wisconsin) and Cedar Rapids, Waterloo and Dubuque (Iowa). Airadigm also continues to offer service in Appleton-Oshkosh.

Airadigm offers services to the consumer market under its Einstein PCS brand name. It also offers a wireline replacement to the commercial marketplace, branded as Airadigm Wireless Business Solutions. The company and its investors originally projected that a large portion of the company's revenue would be realized from business customers. The company's early strategy was to take advantage of the experience of Airadigm and WWCC to offer Centrex, Virtual Trunking, and PBX integration services (services commercial customers were not accustomed to receiving from wireless providers) in the marketplace—in other words, to offer the same range of wireless telephone services to commercial customers as was available from traditional telephone carriers. Airadigm has changed its strategy, however, in response to competitive pressures. Since 1999, several other companies launched wireless voice services in certain of the areas served by Airadigm. Airadigm now also provides roaming services for other wireless carriers, including T-Mobile and Cingular. Currently, Airadigm earns a significant portion of its revenues from this roaming business.

---

[3]    The FCC's "pioneer's preference" program awarded licenses to entities that, among other things, had developed or enhanced a new service or technology.

B.     The Prior Chapter 11 Bankruptcy Case.

Airadigm was undercapitalized from the beginning, and the purchase of the Licenses imposed significant demands on capital. Airadigm used most of its available capital to make the down payments on the Licenses. Furthermore, in addition to making installment payments to the FCC that proved burdensome to an already overextended company, Airadigm had not completed the build-out of the infrastructure as required under the Licenses. If it did not build out its system in a timely manner, Airadigm faced the possibility of losing the Licenses even if its payments to the FCC were current.

Additionally, Airadigm was unable to obtain financing to develop its operations and complete the build-out. After the initial FCC auctions of C-block licenses in 1995-1996 through which Airadigm acquired the Licenses, the capital markets came to view the prices that licensees had bid for C-block licenses as excessive. Auctions for the F-block licenses, which were conducted very shortly after the conclusion of the C-block auctions, generated successful bids that were far lower on a per-megahertz-POP (i.e., per megahertz per person in the license territory) basis. Ultimately, a number of licensees who were successful bidders at the initial C-block auctions surrendered their licenses to the FCC. In early 1999, the FCC reauctioned those surrendered licenses, generating far lower bids per-megahertz-POP than the initial C-block auctions had produced. These lower bids also demonstrated that the value of Airadigm's Licenses was far less than the winning bid price in the earlier auctions. Thus, the values of the Licenses that Airadigm had acquired were far less than Airadigm's debt to the FCC.

The capital markets viewed Airadigm's total debts—roughly $64 million in License debt to the FCC, plus approximately $100 million in other secured debt—as being substantially more than the value of the company. Airadigm was therefore unable to obtain additional financing for needed capital expenditures to finish building out its system and to finance ongoing substantial losses while the company remained in its startup phase. Airadigm also knew that it was likely to default in payments to the FCC if it did not seek bankruptcy relief. On July 28, 1999, in order to operate in a secure financial position while resolving these issues, the Debtor filed a voluntary petition seeking relief under chapter 11 of the Code in the United States Bankruptcy Court for the Western District of Wisconsin.

The 2000 Plan was confirmed on November 15, 2000. The 2000 Plan provided for the sale of Airadigm's assets, including the Licenses, to TDS and Telecorp and the use of the proceeds to satisfy Claims and Equity Interests. As a result of investors' general perspectives on the telecommunications industry and the values of electromagnetic spectrum available to that industry in 2000, at the time, the value of the Licenses was greater than it had been, leading to the offers of TDS and Telecorp to buy Airadigm's assets for amounts sufficient to pay all creditors, including the FCC, in full and provide a distribution to WWCC and OEDA. Furthermore, one of the proponents of the 2000 Plan, and its chief financier, TDS, made certain loans to the Debtor to be repaid according to the 2000 Plan. In addition, subsequent to the confirmation of the 2000 Plan, TDS acquired the Claim and interest of Ericsson, Inc. ("Ericsson") including a pledge in favor of Ericsson of OEDA's Equity Interests in Airadigm. Subsequently, TDS exercised that pledge, foreclosed on the Equity Interest and returned it to

Airadigm as treasury stock.  As a result, WWCC became (and still is) the sole owner of Equity Interests.

      C.      Events Leading to This Bankruptcy Filing.

In the 1999 bankruptcy case, the FCC filed 15 proofs of claim (one for each of the Licenses), for a total of approximately $64 million.  The FCC based the amount of its claims upon the unpaid balances of the bid prices for the Licenses.  In addition, as a result of the commencement of that case, the FCC asserted that the Licenses terminated automatically pursuant to the FCC's automatic cancellation rule for nonpayment because Airadigm did not make payments to the FCC during the bankruptcy case.  In February 2000, Airadigm filed with the Wireless Telecommunications Bureau of the FCC a Contingent Emergency Petition for Reinstatement or in the Alternative for Waiver (of the automatic cancellation rule).  In November 2000, this Court confirmed the 2000 Plan, which provided for the sale of Airadigm's assets, including the Licenses, after the reinstatement of the Licenses by the FCC.

When the 2000 Plan was confirmed, the key legal issue in the dispute between the FCC and Airadigm - whether Licenses could be automatically canceled for nonpayment while the licensee is under bankruptcy protection - was before the United States Court of Appeals for the District of Columbia Circuit, in another case.  In that other case, the D.C. Circuit later found that FCC licenses are not canceled for nonpayment in bankruptcy, and the United States Supreme Court affirmed.  *NextWave v. FCC*, 254 F.3d 130 (D.C. Cir. 2001), *aff'd*, 537 U.S. 293, 123 S. Ct. 832, 154 L. Ed. 2d. 863 (2003).

While the *NextWave* case was pending, the FCC took no action with respect to the Licenses.  Airadigm understood that the FCC took no action because the FCC did not want to jeopardize its legal position in the *NextWave* case by any action that it took with respect to Airadigm.  Finally, on August 8, 2003, based on the Supreme Court's decision in *NextWave*, but more than four years after Airadigm filed its first bankruptcy petition, the FCC entered an order clarifying that its automatic cancellation rule was ineffective as to Airadigm.  In other words, despite having declared in 1999 that the Licenses had terminated, the FCC declared in 2003 that the Licenses had never terminated.  TDS filed a petition to reconsider that ruling in order to have certain matters relating to the Licenses clarified by the FCC.  On April 10, 2006, the FCC adopted its Order on Reconsideration dismissing TDS' petition on standing and other procedural grounds.

The parties negotiating the 2000 Plan (which included the FCC) had not contemplated the FCC's extremely long delay.  Those parties had expected that the FCC would decide Airadigm's Emergency Petition for Reinstatement in early 2001, and that the Licenses would be reinstated.  The parties' expectation that the FCC would timely reinstate the Licenses was bolstered by the fact that the 2000 Plan provided that the FCC would be paid in full from the proceeds of the sale of Airadigm's assets to TDS and Telecorp following the FCC's reinstatement of the Licenses.  Based on that expectation, TDS made loans to Airadigm to fund the 2000 Plan and made construction loans so that Airadigm could complete its network build-out.  OEDA and Ericsson, two creditors with substantial claims, also supported the 2000 Plan in the belief that they would be paid in full.

The decision that the Licenses were never canceled was a pyrrhic victory for Airadigm and the other proponents of the 2000 Plan. Because the FCC did not approve the 2000 Plan or act upon Airadigm's Emergency Petition for Reinstatement in a timely manner, Airadigm could not sell its assets, including the Licenses, in the time contemplated by the 2000 Plan. Once again, the value of the Licenses declined significantly. New auctions in some markets, sales of spectrum in other bankruptcies and the general consolidation of the wireless industry all contributed to the decline in the Licenses' value. Even though the FCC finally declared that the Licenses were never canceled, four years were wasted, during which the value of Airadigm as a going concern, as well as the value of its assets, including the Licenses, declined significantly, and the obligations of Telecorp and TDS to purchase the Licenses had lapsed.

The Debtor cannot satisfy its current debt to the FCC and TDS in full as provided in the 2000 Plan from present operations. It would be able to make payments to the FCC and TDS only by obtaining external financing. Since that indebtedness far exceeds the Debtor's value as a going concern, it is not possible for the Debtor to obtain that financing. The Debtor is unable to continue as a going concern under the constraints that exist on its operations and its inability to refinance its indebtedness. Accordingly, the Debtor filed this bankruptcy case in order to restructure its obligations to the FCC so that those obligations will be no greater than the value of the Licenses. The 2006 Plan will also restructure the debt to TDS, but otherwise provides for payment in full (without interest) of the claims of other creditors. Under those conditions, Airadigm expects to be able to obtain the necessary financing from TDS and continue in business as a profitable enterprise.

## III.   SUMMARY OF THE 2006 PLAN OF REORGANIZATION

A.   <u>Description of the 2006 Plan</u>.

The key features of the 2006 Plan are as follows: (1) to the extent it has a perfected Lien on the Licenses, the FCC will receive payment of the full value of the Licenses (or Partial Licenses) that the Debtor retains in cash on the Payment Date; (2) the Debtor will return to the FCC the Licenses (or Partial Licenses) that the Debtor elects not to retain; (3) the Secured Claims of TDS will be paid on agreed terms; (4) unsecured creditors holding Claims of $10,000 or less will be paid 100% of their Allowed Claims in cash, without interest, on the Payment Date; (5) all existing common stock in the Debtor will be canceled, and the other unsecured creditors (including the FCC and TDS to the extent their Claims are unsecured) will share pro rata 100% of the newly issued common stock in full satisfaction of the portions of their claims that are not Secured Claims; and (6) to the extent necessary, the payments required under the 2006 Plan will be financed by a loan from TDS.

The 2006 Plan is more fully described below. HOWEVER, THE DESCRIPTION CONTAINED HEREIN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE 2006 PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A. PARTIES IN INTEREST SHOULD READ THE 2006 PLAN IN ITS ENTIRETY.

B.    <u>Classification of Claims and Interests</u>.

Unclassified Claims consist of Administrative Expense Claims, including Claims for professional fees and expenses subject to approval under Code § 330 and other Claims that are incurred by Airadigm after the Petition Date and either allowed under Code § 503(b) or incurred in the ordinary course of business.

The 2006 Plan classifies the Claims of creditors and the Interests of shareholders into seven classes:

1.    Class 1 (Priority Claims):  All Allowed Priority Claims (comprising all claims other than Administrative Expense Claims entitled to priority under Code § 507). This Class includes Claims for employee compensation and contributions to employee benefit plans; deposits by customers; and certain taxes.  Since Airadigm has paid its operating expenses as they have come due for the past several years, it does not anticipate any significant Priority Claims, other than taxes.

2.    Class 2 (FCC Secured Claims):  The Claims of the FCC, to the extent they are Secured Claims, which are divided into subclasses as set forth below.  These are the Claims arising from Airadigm's purchase of the Licenses, to the extent of the current value of the Licenses securing such Claims, as determined by the Court:

| SUB-CLASS | BTA | MARKET NAME | FREQ. | MHz |
|---|---|---|---|---|
| 2A | 18 | Appleton, Wisconsin | C | 30 |
| 2B | 70 | Cedar Rapids, Iowa | C | 30 |
| 2C | 118 | Dubuque, Iowa | F | 10 |
| 2D | 123 | Eau Claire, Wisconsin | C | 30 |
| 2E | 148 | Fond du Lac, Wisconsin | C | 30 |
| 2F | 173 | Green Bay, Wisconsin | C | 30 |
| 2G | 216 | Janesville, Wisconsin | C | 30 |
| 2H | 234 | La Crosse, Wisconsin | C | 30 |
| 2I | 272 | Madison, Wisconsin | C | 30 |
| 2J | 276 | Manitowoc, Wisconsin | C | 30 |
| 2K | 279 | Marinette, Wisconsin | F | 10 |
| 2L | 417 | Sheboygan, Wisconsin | C | 30 |
| 2M | 432 | Stevens Point, Wisconsin | C | 30 |
| 2N | 462 | Waterloo, Iowa | C | 30 |
| 2O | 466 | Wausau, Wisconsin | C | 30 |

3.    Class 3 (TDS Secured Claims):  The Claims of TDS, to the extent they are Secured Claims (that is, the Claims of TDS to the extent of the current value of the collateral securing such Claims), which consist of the following subclasses:

(a)    3A: All Secured Claims of TDS related to the Confirmation Loan made pursuant to Sections 6.2 and 6.3 of the 2000 Plan;

(b)     3B: All Secured Claims of TDS related to the Construction Loans made pursuant to Section 6.8 of the 2000 Plan;

(c)     3C: All Secured Claims of TDS related to the TDS Purchased Claim 1;

(d)     3D: All Secured Claims of TDS related to the TDS Purchased Claim 2.

4.      Class 4 (Miscellaneous Secured Claims):  All Secured Claims not otherwise provided for in the 2006 Plan.

5.      Class 5 (Unsecured Claims): The Claims of unsecured creditors that exceed $10,000 and the Claims of the FCC and TDS identified in §§ 3.3 and 3.4 of the 2006 Plan, to the extent they are unsecured Claims under § 506(a) of the Bankruptcy Code (that is, the Claims of the FCC and TDS to the extent those Claims exceed the value of the collateral securing them and to the extent the FCC's Lien is avoided).

6.      Class 6 (Convenience Claims):  All Convenience Claims.

7.      Class 7 (Equity Interests):  All Equity Interests.  WWCC is the sole holder of Equity Interests, since it owns 100% of the common stock in Airadigm and there is no other class of stock.

C.      <u>Treatment of Unclassified Claims.</u>

The 2006 Plan provides that professional fees and expenses and other Administrative Expense Claims arising outside the ordinary course of business will be paid in full on the Payment Date, or the date on which such Claim is allowed if that is after the Payment Date, unless the Reorganized Debtor, TDS and the holder of such a Claim agree to payment on another date.  Administrative Expense Claims arising in the ordinary course of business include expenses such as trade payables, employee salaries and benefits, taxes and rent. These ordinary course expenses will be paid in the Debtor's ordinary course of business and according to their terms, whether or not the Claims have been Allowed.

U.S. Trustee Fees payable under 28 U.S.C. § 1930 will be paid when due in accordance with Code § 1129(a)(12) until the Case is converted, dismissed or closed.

D.      <u>Treatment of Classified Claims.</u>

1.      **Class 1 (Priority Claims)**.  Class 1 Claims are **unimpaired**.  On the Effective Date, or such other date as the Reorganized Debtor, TDS and the holder agree, the Reorganized Debtor will pay the holder of each Allowed Class 1 Claim the full amount of such Claim in cash, unless such holder otherwise agrees.  Any Class 1 Claims that are not Allowed Claims on the Effective Date will be paid on the Payment Date.

2.      Class 2 (FCC Secured Claim).  Class 2 Claims are impaired.

(a)     Each Class 2 Claim of the FCC that the Court determines is a Secured Claim shall be Allowed in the amount determined by the Court and all such claims will be satisfied in full as follows:

**First,** the Reorganized Debtor will determine no later than the eleventh day after the Confirmation Date which Licenses or Partial Licenses it elects to retain and which it elects to surrender; provided that any such election is subject to the approval of TDS.  All Licenses and Partial Licenses will either be paid or surrendered as further described in this subparagraph (a).

**Second,** with respect to each License that the Reorganized Debtor elects to retain, it will pay the holder of the Class 2 Claim secured by that License the full amount of that Claim, without interest (except as provided in Code § 506(b)), in cash on the Payment Date, less a credit for the full amount of payments made by the Debtor on account of the License before the Petition Date.

**Third,** with respect to each Partial License that the Reorganized Debtor elects to retain, it will pay the holder of the Class 2 Claim secured by the License from which the Partial License was Partitioned or Disaggregated an amount equal to the Retained Pro Rata Portion of that Claim, without interest (except as provided in Code § 506(b)), in cash on the Payment Date, less a credit for the full amount of payments made by the Debtor on account of the entire License before the Petition Date.

**Fourth,** with respect to each License that the Reorganized Debtor elects to surrender, the Reorganized Debtor will surrender that License on the Payment Date to the holder of the Class 2 Claim secured by that License and shall receive a credit against any Claim held by such holder in an amount equal to the greater of:  (a) the current market value of the License as determined by the Court, or (b) the net original bid price for such License, plus the amount of any other payments made by the Debtor on account of the License before the Petition Date.

**Fifth,** with respect to each Partial License that the Reorganized Debtor elects to surrender, the Reorganized Debtor will surrender that Partial License on the Payment Date to the holder of the Class 2 Claim secured by the License from which the Partial License was Partitioned or Disaggregated and shall receive a credit against any Claim held by such holder in an amount equal to the Surrendered Pro Rata Portion of the greater of either (a) the current market value of the License as

determined by the Court, or (b) the net original bid price for such License.

(b)      Upon satisfaction of the Class 2 Claims in accordance with the foregoing, the Liens in the Licenses securing such Claims will be released, and the Reorganized Debtor will own any Licenses or Partial Licenses it has retained free and clear of all liens, claims or encumbrances.

(c)      If the holder of a Class 2 Claim makes the election described in Code § 1111(b) to treat its entire Claim as a Secured Claim, then (i) it will retain its Lien to the extent of the allowed amount of the Secured Claim, and (ii) the Reorganized Debtor will satisfy the Secured Claim with respect to which such election is made by investing the cash amount that would otherwise be payable (if no § 1111(b) election had been made) under section (a) of this Article to purchase, for the benefit of such holder, either, at the election of the Reorganized Debtor, (x) a security representing either an obligation of the United States or an obligation guaranteed by an agency of the United States and backed by the full faith and credit of the United States, or (y) an annuity contract issued by an insurance company having an "A" rating or better from A.M. Best Company or Standard & Poor's. The terms of such security or annuity shall be such that the FCC will receive, in no more than 30 years, deferred cash payments totaling at least the full amount of its Secured Claim, of a value, as of the Effective Date, of the License or Partial License that secures such Secured Claim.

3.    **Class 3 (TDS Secured Claims):**  Class 3 Claims are **impaired**.  The holder of the Class 3 Claims will retain its Liens until such Claims are satisfied in full, at which time such Liens will be released.  The Reorganized Debtor will satisfy the Class 3 Claims in full as follows:

(a)      The Class 3 Claims will bear interest on the Allowed amount of such Claims from and after the Effective Date at the rate of 10 % per annum (or such other rate as the Debtor and TDS agree prior to the Confirmation Date).

(b)      For the first three (3) years after the Effective Date, the Reorganized Debtor will pay only accrued interest in six (6) semi-annual payments, making the first such payment on the first day of the seventh month following the month in which the Effective Date occurs and each of the next five (5) interest payments on the first day of each sixth month thereafter.

-18-

      (c)      Beginning on the first day of the forty-second month after the month in which the Effective Date occurs, the Allowed amount of the Class 3 Claims will be amortized over a term of eighty-four (84) months thereafter, and the Reorganized Debtor will make equal semi-annual installment payments of principal plus accrued interest, with a balloon payment on the first day of the one-hundred-second month after the month in which the Effective Date occurs of the entire unpaid balance of principal and accrued interest.

      4.    **Class 4 (Miscellaneous Secured Claims)**:  Class 4 Claims are **unimpaired**.  Holders of Class 4 Claims shall retain their Liens until paid.  On the Effective Date, the Reorganized Debtor shall, at its election, either pay the Class 4 Claim in full, in cash, or shall surrender the collateral securing the Claim to the holder, in full and complete satisfaction of the Claim.

      5.    **Class 5 (Unsecured Claims)**:  Class 5 Claims are **impaired**.  Holders of Class 5 Claims will receive common shares of voting stock in the Reorganized Debtor on the Effective Date (or with respect to such Claims not Allowed by the Effective Date, on the Payment Date).  One common share shall be issued to each Class 5 claimant for each $500,000 of its Allowed Claim. To the extent any such claimant would receive a fractional share of common stock, the Debtor at its option may, in lieu of issuing such fractional share, pay that claimant in cash an amount equal to the portion of the Class 5 Claim that would otherwise entitle the holder to such fractional share.

      6.    **Class 6 (Convenience Claims)**:  Class 6 Claims are **impaired**.  On the Payment Date, the Reorganized Debtor will pay Allowed Class 6 Claims in cash in the full amount of each Allowed Claim without interest.

      7.    Class 7 Equity Interests are **impaired** and will be canceled on the Effective Date.

    E.    <u>Means of Implementation</u>.

The payments required under the 2006 Plan will be made from the Reorganized Debtor's cash on hand.  However, if the Reorganized Debtor has insufficient cash or reserves, the 2006 Plan provides that TDS or its designee will make the Confirmation Loan in order to advance sufficient funds to the Reorganized Debtor.  The Confirmation Loan will be combined with the allowed Secured Claim amounts owed to TDS, and will be paid in accordance with the 2006 Plan's treatment of TDS' Class 3 Claim.  An additional element of the 2006 Plan is the conversion of the unsecured claims of the FCC and TDS to equity in the Reorganized Debtor.

F.    <u>Executory Contracts and Unexpired Leases</u>.

Except to the extent the Court orders otherwise on motion of the Debtor filed no later than the Effective Date, all executory contracts and unexpired leases of the Debtor will be assumed on the Effective Date.  If any party to such a contract or lease wishes to object to such assumption, or claims that there is a default under such contract or lease that must be cured under Code § 365(b), that party must file an objection no later than the Confirmation Date.  If no such objection is filed by that date, that party's objection or claim will be forever barred and may not be asserted in any subsequent proceeding in any forum.

G.    <u>Retention of Jurisdiction</u>.

From and after the Confirmation Date, the Court may retain jurisdiction for the following purposes:

- To consider any modification to the 2006 Plan, or to correct any defect, cure any omission, or reconcile any inconsistency in the 2006 Plan or in the order confirming the 2006 Plan, to the extent necessary to carry out the purposes and intent of the 2006 Plan;

- To hear and determine any objections to the allowance of Claims and requests for estimation of Claims;

- To hear and determine any and all applications, adversary proceedings, motions and other contested matters not resolved in the 2006 Plan;

- To hear and determine any and all applications for compensation of professional services and disbursements and any other similar fees incurred prior to the Confirmation Date;

- To enforce the terms and provisions of payments, rights and interests required or created by the 2006 Plan or by earlier orders of the Court; and

- To enter any order necessary to consummate, interpret, and effect the provisions of the 2006 Plan and the order confirming the 2006 Plan, or as may otherwise be required by the Code.

H.    <u>Release of Claims and Miscellaneous Provisions</u>.

1.    General Release of Claims.

(a)    On the Effective Date, any and all claims, rights, causes of action and remedies under Code §§ 541, 544, 545, 547 through 551, and 553 will be released and barred, and no proceeding under any such section shall be commenced; provided, however, that any such proceeding commenced by the Debtor before the Effective Date is excepted from this

-20-

paragraph of the 2006 Plan and is retained and may be enforced by the Reorganized Debtor.

(b)     Except as expressly provided in the 2006 Plan, on the Effective Date, any and all Claims of the Debtor against TDS shall be released and forever discharged.  Except as expressly provided in the 2006 Plan, as of the Confirmation Date, neither TDS, its Affiliates, its parents or subsidiaries, nor any of their respective members, shareholders, officers, directors, employees, agents, attorneys, or professionals shall have or incur any liability to the Debtor, the Reorganized Debtor, or to any holder of any Claim or equity interest for any act or omission arising out of or in connection with the Case, the confirmation of the 2000 Plan or the 2006 Plan, the consummation of the 2000 Plan or the 2006 Plan, or the administration of the 2000 Plan or the 2006 Plan or property to be distributed under the 2000 Plan or the 2006 Plan, except for willful misconduct.

2.     Retiree and Other Employee Benefits.

No employee benefits will be affected by the 2006 Plan.  To the extent that the Debtor is obligated to provide retiree benefits, as that term is defined in Code § 1114, the Reorganized Debtor will continue to provide such benefits for the duration of the period the Debtor has obligated itself to provide such benefits.

## IV.   INSIDER TRANSACTIONS

A.     The Debtor leases its Little Chute office building from Benson, Vande Hey LLP, a limited liability partnership in which Roy Vande Hey (a director of the Debtor and president and a stockholder of WWCC) and George Benson (chairman and a stockholder of WWCC) have interests.

B.     WWCC is a sales agent of Airadigm and, in that capacity, receives monthly commissions on account of WWCC's sales to business customers.

C.     Airadigm is a party to a management agreement with WWCC pursuant to which Airadigm is to pay a management fee in the amount of approximately $10,000 per month in exchange for management services.  The Debtor believes this to be a reasonable rate in light of the management services provided by WWCC.

## V.   PROJECTIONS

The projections included as Exhibit B to this Disclosure Statement (the "Forecast") are dependent upon the successful implementation of the Debtor's business plan and the reliability of the other assumptions contained therein.  The Forecast reflects numerous assumptions including confirmation and consummation of the 2006 Plan in accordance with

its terms, the anticipated future performance of the Debtor, industry performance, and general business and economic conditions, most of which are and will be beyond the control of the Debtor. Moreover, unanticipated events and circumstances occurring subsequent to the preparation of the Forecast may affect the actual financial results achieved throughout the periods covered by the Forecast. Accordingly, actual future performance may vary materially from the Forecast.

## VI.    SELECTED CODE REQUIREMENTS

The Code imposes certain requirements in order for a chapter 11 plan to be confirmed. To confirm the 2006 Plan, the Court must find that all conditions of either § 1129(a) or (b) are met. Thus, even if each class of creditors accepts the 2006 Plan, the Court must undertake an independent evaluation of the 2006 Plan's feasibility and of the other statutory requirements before confirming the 2006 Plan.

A.    Best Interest Test.

Before confirming the 2006 Plan, the Court must determine that the 2006 Plan provides to each member of each impaired class of Allowed Claims a recovery that is at least equal to the distribution that such member would receive if the estate of the Debtor were liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code. As demonstrated in the liquidation analysis attached hereto as Exhibit B, no creditor would receive more in a Chapter 7 liquidation than under the 2006 Plan.

Because of the FCC's $64 million claim secured by all of the Debtor's Licenses, and TDS' $136 million claim secured by all of Debtor's other assets, in a Chapter 7 case, after allowing for payment of Administrative Expense Claims and the Class 1 Claims, the Debtor's assets would be insufficient to pay unsecured creditors any amounts, while the 2006 Plan provides for payment in full (without interest) to those creditors. As stated above, the market value of the Licenses is far less than the $64 million owed to the FCC. The value of the remaining assets (those securing the TDS claim) is far less than the $136 million owed to TDS, since the infrastructure and other assets have limited value without the Licenses. Because under the 2006 Plan the FCC and TDS will be receiving property equal to the going concern value of their collateral, including Equity Interests in the Reorganized Debtor, they will receive under the 2006 Plan at least as much as they would receive in a hypothetical Chapter 7 case. Therefore, the 2006 Plan satisfies the best interests test of Code § 1129(a)(7).

B.    Feasibility and Administrative Expense Claims.

Under Code § 1129(a)(11), the 2006 Plan can only be confirmed if it is feasible, which means that it is not likely to be followed by a liquidation, or the need for further financial reorganization, of the debtor or its successor. Airadigm will have a sufficient cash balance on the Effective Date to meet its operating needs and to pay Administrative Expense Claims when it emerges from bankruptcy. If Airadigm's cash on hand is not sufficient to make all the payments, the 2006 Plan provides that TDS will provide back-up financing to

make up the difference.  TDS' ability to make the loan will be demonstrated at the Confirmation Hearing.  Because the 2006 Plan can be implemented with cash on hand and the TDS back-up loan, and because Airadigm will be in a position to become a solvent, profitable company after the Effective Date (as demonstrated by the Forecast), the 2006 Plan is not likely to be followed by the further liquidation of, or the need for further financial reorganization of, the Debtor.  Therefore, the 2006 Plan satisfies Code § 1129(a)(11).

Cram Down

In order for the 2006 Plan to be confirmed by the Court, it must either be accepted by each impaired class of Claims, or it must be confirmable under the "cram down" provisions of Code § 1129(b).  A class of Claims has accepted the 2006 Plan if it has been accepted by creditors holding at least two thirds in amount, and more than one half in number, of the Allowed Claims of such class held by creditors that have accepted or rejected the 2006 Plan. A class that is unimpaired under the 2006 Plan is deemed to have accepted the 2006 Plan, and a class that is not entitled to receive or retain any property under the 2006 Plan is deemed to have rejected the 2006 Plan.

The Code allows the Court to confirm a plan over the rejection of a class of impaired creditors if the plan does not discriminate unfairly, and is fair and equitable, with respect to the claims of the impaired class.  Generally, with respect to holders of Secured Claims, this provision means that unsecured creditors, junior secured creditors and holders of Equity Interests cannot receive any payment unless any objecting class of Secured Claims receives the value or the "indubitable equivalent" of the collateral.  Under the terms of the 2006 Plan, the FCC, which has a lien on the Licenses, will receive either cash in the amount of the value of the collateral (such amount to be determined by the Court) or the collateral itself (or some combination thereof).  Therefore, the 2006 Plan satisfies the requirements of Code § 1129(b) with respect to the Class 2 Secured Claims of the FCC.  The other impaired secured creditor, TDS, is expected to agree to the terms of the 2006 Plan.  Therefore, Airadigm will not be required to satisfy Code § 1129(b) with respect to the Class 3 Secured Claim of TDS.

With respect to unsecured creditors, the fair and equitable test of Code § 1129(b) generally requires that, if a dissenting class of unsecured claims does not receive payment in full, then no junior class may receive anything under the 2006 Plan.  This is known as the "absolute priority rule."  The 2006 Plan satisfies the absolute priority rule because the only class junior to Class 5 and Class 6 (the unsecured Classes) is Class 7, the Equity Interests, and the holders of Equity Interests will receive nothing under the 2006 Plan.

VII.    FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain expected federal income tax consequences of the implementation of the 2006 Plan.  No opinion of counsel has been obtained and no ruling has been requested or obtained from the Internal Revenue Service with respect to any of the tax aspects of the 2006 Plan, and the discussion set forth herein is not binding upon the Internal Revenue Service. CREDITORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES TO THEM, UNDER

FEDERAL AND APPLICABLE STATE AND LOCAL TAX LAWS, OF THE CONFIRMATION AND CONSUMMATION OF THE 2006 PLAN.

A.    Tax Consequences to Creditors.

Creditors may be required to recognize income or may be entitled to a deduction as the result of the implementation of the 2006 Plan. The exact tax treatment will depend on each creditor's method of accounting and the nature of each Claim in the hands of the creditor. Generally, a creditor will recognize gain or loss equal to the difference between the amount of cash received and the creditor's tax basis in the Claim. Such gain or loss may be a capital gain or loss depending upon the creditor's particular tax situation and the nature of the Claim in the creditor's hands. Gain recognized by a creditor with respect to a Claim for which a bad debt deduction has been claimed generally will be treated as ordinary income to the extent of any such prior deduction.

B.    Tax Consequences to the Debtor.

Upon consummation of the 2006 Plan, the Debtor may receive a discharge of a portion of its indebtedness. Generally, a discharge or forgiveness of indebtedness creates taxable income for the taxpayer granted the discharge. Under the Internal Revenue Code, however, an exception is provided if the taxpayer is under the jurisdiction of a bankruptcy court in a case under the Bankruptcy Code, and the taxpayer is granted a discharge of indebtedness by the court or pursuant to a plan approved by the court. Accordingly, the Debtor will not be required to include as income any amount resulting from any discharge of indebtedness under the 2006 Plan.

## VIII.  RISK FACTORS

Creditors will receive full payment under the 2006 Plan only if the conditions to effectiveness of the 2006 Plan are met. Plan confirmation and effectiveness are subject to certain risks.

A.    Confirmation of the 2006 Plan.

There can be no assurance that the requisite acceptances to confirm the 2006 Plan will be received. Regardless of whether all Classes of Claims or Interests accept (or are deemed to have accepted) the 2006 Plan, it is possible that the Court, which sits as a court of equity and may exercise substantial discretion, may not confirm the 2006 Plan. Code § 1129 sets forth the requirements for confirmation and requires, among other things: (1) that the 2006 Plan has classified Claims and Interests in a permissible manner; (2) that the contents of the 2006 Plan comply with the requirements of the Code; (3) that the Debtor has proposed the 2006 Plan in good faith; (4) that the confirmation of the 2006 Plan not be likely to be followed by a need for further financial reorganization of the Debtor; and (5) that the value of distributions to dissenting creditors and Equity Interest holders not be less than the value of distributions such creditors and Equity Interest holders would receive if the Debtor were

liquidated under chapter 7 of the Code. The Debtor believes that all of these conditions have been, or will be, met.

If any impaired Class rejects the 2006 Plan, pursuant to Code § 1129(b), the Court may still confirm the 2006 Plan at the request of the Debtor if, among other things, at least one impaired Class (without counting insiders) has voted to accept the 2006 Plan and as to each impaired Class which has not accepted the 2006 Plan, (a) the 2006 Plan does not discriminate unfairly with respect to each such Class; (b) the 2006 Plan is "fair and equitable" with respect to each such Class; and (c) the 2006 Plan satisfies the requirements set forth in Code § 1129(a) other than § 1129(a)(8). The Debtor believes that the 2006 Plan affords fair and equitable treatment for all Allowed Claims and Interests. If one or more of the impaired Classes of Claims or Interests votes to reject the 2006 Plan, the Debtor may request that the Court confirm the 2006 Plan by application of the "cram down" procedures available under Code § 1129(b). There can be no assurance, however, that the Court would confirm the 2006 Plan.

Any objection to the 2006 Plan by a creditor or equity interest holder could also prevent or delay confirmation of the 2006 Plan. Although the Debtor believes that the 2006 Plan will meet such challenges, there can be no assurance that the Court will reach the same conclusion. Additionally, there can be no assurance that modifications to the 2006 Plan will not be required for confirmation, or that any such modifications would not require a resolicitation of acceptances.

      B.    <u>Disputed Claims</u>.

A number of Claims are disputed, and the total amount of Claims (including disputed Claims) may exceed the expectations assumed in the drafting of the 2006 Plan.

      C.    <u>Conditional Nature of the 2006 Plan</u>.

It is a condition to confirmation that the Debtor and TDS approve the form and substance of the Confirmation Order and the 2006 Plan. In addition, the success of the 2006 Plan depends on TDS providing funding in the form of the Confirmation Loan. The Debtor believes that TDS is able to make and is committed to making the Confirmation Loan.

The Effective Date of the 2006 Plan will not occur until the Debtor has obtained all necessary FCC approval and any other regulatory approval, on usual and customary terms and conditions, that may be required to effectuate the 2006 Plan.

## IX.   MISCELLANEOUS PROVISIONS

      A.    <u>Binding Effect of the 2006 Plan</u>.

Pursuant to Code § 1141(a), if the 2006 Plan or any plan is confirmed, the confirmed plan's provisions will bind the Reorganized Debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or

general partner in the Debtor, regardless of whether such entity's claim or interest is impaired under the plan or whether such entity accepted the plan.

      B.       Withdrawal or Revocation of the 2006 Plan.

The Debtor reserves the right to revoke or withdraw the 2006 Plan at any time prior to its substantial consummation (as that term is defined in Code § 1101(2)). If the 2006 Plan is revoked or withdrawn, the 2006 Plan will be null and void and have no force or effect. In such event, nothing contained in the 2006 Plan shall be deemed to constitute a waiver or release of any Claim by or against the Debtor or to prejudice in any manner the rights of the Debtor in any further proceedings involving the Debtor.

      C.       Modification of the 2006 Plan.

The Debtor may alter, amend or modify the 2006 Plan under Code § 1127 or as otherwise permitted at any time prior to the Effective Date. After the Confirmation Date and prior to the substantial consummation of the 2006 Plan, and in accordance with the provisions of Code § 1127(b) and with the Bankruptcy Rules, the Debtor and any party in interest may, so long as the treatment of holders of Claims or Equity Interest under the 2006 Plan is not adversely affected, institute proceedings in the Court to remedy any defect or omission or to reconcile any inconsistencies in the 2006 Plan, this Disclosure Statement or the Confirmation Order and any other matters as may be necessary to carry out the purposes and effects of the 2006 Plan; provided, however, that prior notice of such proceedings shall be served in accordance with Bankruptcy Rule 2002.

      D.       Governing Law.

Except to the extent that the Code or Bankruptcy Rules or other federal laws are applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with the 2006 Plan, the construction, implementation and enforcement of the 2006 Plan and all rights and obligations arising under the 2006 Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Wisconsin, without giving effect to conflicts-of-law principles which would apply the law of a jurisdiction other than the State of Wisconsin or the United States of America.

## X.    CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the 2006 Plan is preferable to any of the alternatives because it will provide the greatest recovery to Claimholders. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. The Debtor urges Claimholders entitled to vote on the 2006 Plan to vote to accept the 2006 Plan.

Respectfully submitted this 13th day of June, 2006.

AIRADIGM COMMUNICATIONS, INC.

By _____
    Robert J. Galle, Chief Executive Officer

GOLDBERG, KOHN, BELL, BLACK,
   ROSENBLOOM & MORITZ, LTD.
Ronald Barliant
Alan P. Solow
Kathryn A. Pamenter
55 East Monroe Street
Suite 3700
Chicago, Illinois  60603
Telephone: (312) 201-4000
Facsimile: (312) 332-2196