**THIS ORDER IS SIGNED AND ENTERED.**

**Dated: October 31, 2006**

_____
**Hon. Robert D. Martin**
**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

_____

AIRADIGM COMMUNICATIONS, INC.,                          (Chapter 11)

        Debtor.                                 Case Number: 06-10930

_____

MEMORANDUM DECISION
ON
PLAN CONFIRMATION

_____

A final hearing on confirmation of Airadigm Communications, Inc.'s ("Airadigm") Second Amended Plan of Reorganization was held on September 28, 2006. I took the matter under advisement and left open the record for supplemental submissions. All major parties filed supplements: Airadigm filed a Third Amended Plan of Reorganization; the Federal Communications Commission ("FCC") filed an objection; and both Airadigm and Telephone & Data Systems, Inc. ("TDS") filed responses to the FCC's objection. Airadigm's supplemental submission, the Third Amended Plan ("the 2006 plan") which is attached hereto is the subject of this decision. I consider the supplemental factual submissions pursuant to Federal Rule of Bankruptcy Procedure

9017.[1]

## I.    BACKGROUND

This is Airadigm's second bankruptcy case.    Airadigm is a mobile telephone company that holds 15 PCS (Personal Communications Services) licenses ("the licenses") in Wisconsin, Iowa, and Michigan.    Airadigm filed its first chapter 11 petition on July 28, 1999 ("the 1999 case").    The FCC then canceled the licenses but allowed Airadigm to continue using the rights they conveyed.    In 2003 the U.S. Supreme Court ruled it illegal for the FCC to cancel PCS licenses solely because licensees filed for bankruptcy.    F.C.C. v. NextWave Personal Communications, Inc., 537 U.S. 293, 123 S.Ct. 832 (2003).

The FCC acknowledged that NextWave applied to Airadigm's 1999 case.    In re Airadigm Communications, Inc., 2003 WL 21878647, 18 F.C.C.R. 16296 (2003). However, before that happened, this court had confirmed a plan of reorganization ("the 2000 plan") over the FCC's objection.    The 2000 plan recognized that the licenses had been cancelled and provided alternative means to implement the plan depending upon when the FCC might reinstate them.    The primary treatment was that TDS and another party would issue a reinstatement loan to pay off the FCC and other secured creditors, if the FCC reinstated the licenses before February 2001.    2000 Plan ¶¶ 6.4, 6.5.    There was a four-month grace period, after which TDS and the other lender would have the option of making the loan for one more year—until June 30, 2002.    Id. ¶¶ 10.3, 10.4.    After that date, the 2000 plan made no provision for making a reinstatement loan.    Nor did it

---

[1] Fed. R. Bankr. Proc. 9017 incorporates Fed. R. Civ. Proc. 43, subsection (e) of which states: "When a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or deposition."  The Federal Rules of Evidence apply to these affidavits and I have considered the parties' objections on those grounds.

specify how Airadigm would continue operating without one. The Airadigm licenses were never formally reinstated. On May 20, 2004, the FCC's entire claim for $64,219,422.55 was allowed. That claim was never paid.

Before the 1999 case was closed, Airadigm filed this second chapter 11 case on May 8, 2006. The FCC objected, but its objection was resolved when the parties stipulated that all their rights from the 1999 case were preserved and that the 2000 plan had been "substantially consummated." The 1999 case was closed on June 27, 2006.

Prior to the hearing on plan confirmation, there was a valuation hearing at which I determined that Airadigm's licenses are now worth a total of $33,009,164. That determination was not appealed. The FCC has voted against the 2006 plan and has objected to its confirmation.

## II.    STANDARD FOR CONFIRMATION

A chapter 11 plan must meet the requirements of § 1129 of the Bankruptcy Code in order to be confirmed.

> With one exception, to be discussed, a plan must meet all 13 requirements. They are: (1) the plan's compliance with Title 11, (2) the proponent's compliance with Title 11, (3) the good faith proposal of the plan, (4) the disclosure of payments, (5) the identification of management, (6) the regulatory approval of rate changes, if applicable, (7) the "best interest" test, (8) the unanimous acceptance by impaired classes, (9) the treatment of administrative and priority claims, (10) the acceptance by at least one impaired class of claims, (11) the feasibility of the plan, (12) the bankruptcy fees, and (13) retiree benefits.

In re 203 N. LaSalle St. P'ship, 126 F.3d 955, 960 (7th Cir. 1997), rev'd on other grounds sub nom Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S.

434, 119 S.Ct. 1411 (1999).[2]  If one or more impaired classes votes to reject the plan, the

plan still can be confirmed if it meets the additional requirements of § 1129(b): "the plan

does not discriminate unfairly, and is fair and equitable, with respect to each class of

claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. §

1129(b)(1) (2006).   The proponent of a chapter 11 plan has the burden of proving

compliance with these requirements, by a preponderance of the evidence.  Matter of

Briscoe Enters., Ltd., II, 994 F.2d 1160, 1163-65 (5th Cir. 1993) (applying Grogan v.

Garner, 498 U.S. 279, 289-90, 111 S.Ct. 654 (1991) to 11 U.S.C. 1129(a)).

## III.    NONDEBTOR RELEASE

The first disputed term of the 2006 plan is a provision that releases TDS from

liability "to any holder of any Claim or equity interest for any act or omission arising out

of or in connection with the Case, the confirmation of this Plan, the consummation of this

Plan, or the administration of this Plan or property to be distributed under this Plan,

except for willful misconduct."  2006 Plan ¶ 8.1(b).  Section 1129(a) requires that a plan

comply with the "applicable provisions" of title 11 of the United States Code.   The

Bankruptcy Code does not define which provisions are "applicable."   Certainly included

are provisions that apply directly to chapter 11 plans, including §§ 1122 (classification of

claims and interests in a plan), 1123 (contents of a plan), and 1124 (impairment of claims

and interests in a plan).   See S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978)

("Paragraph (1) requires that the plan comply with the applicable provisions of chapter

11, such as section 1122 and 1123, governing classification and contents of a plan").

---

[2] In 2005, Congress amended the Bankruptcy Code to include three additional requirements: (14) domestic
support obligations, (15) objections by unsecured creditors of individual debtors, and (16) transfers of
property by non-moneyed corporations and trusts.  11 U.S.C. § 1129(14)-(16) (2006).  These requirements,
to the extent they apply, are satisfied in this case.

4

Courts also have required compliance with less directly related provisions of the Code, especially § 524(e), which states "discharge of a debt of the debtor does not affect the liability of any other entity on . . . such debt."  11 U.S.C. § 524(e); <u>see</u> <u>In re Sybaris Clubs Int'l, Inc.</u>, 189 B.R. 152 (Bankr. N.D. Ill. 1995) (denying confirmation to plan because it required bankruptcy court to issue an injunction releasing third parties from liability, which was outside its jurisdiction).

The FCC argues that the release of TDS violates both § 524(e) and § 1123(b)(6). Section 1123(b)(6) is stated permissively and does not purport to bar nondebtor releases. It states that "[s]ubject to subsection (a) of this section, a plan may—(6) include any other appropriate provision not inconsistent with the applicable provisions of this title."  11 U.S.C. § 1123(b)(6).  This provision does not appear to directly exclude anything more than § 1129(a)(1).

The U.S. Court of Appeals for the Seventh Circuit apparently has not ruled on whether a nonconsensual chapter 11 plan can provide for the discharge of claims against a non-debtor when those claims are not also against property of the estate.  <u>Cf.</u> <u>Union Carbide Corp. v. Newboles</u>, 686 F.2d 593, 595 (7th Cir. 1982) (under Bankruptcy Act of 1898, "the bankruptcy court has no power to discharge the liabilities of a bankrupt's guarantor"); <u>Matter of Specialty Equip. Co.</u>, 3 F.3d 1043, 1047 (7th Cir. 1993) (noting that <u>Newboles</u> "rel[ied] on Section 16 of the Bankruptcy Act of 1898, which is more explicit than section 524(e) of the current Bankruptcy Code").  A bankruptcy court "can enjoin a creditor from suing to enforce a preexisting lien" in former property of the estate that a bankruptcy trustee sold free and clear.  <u>Fogel v. Zell</u>, 221 F.3d 955, 965 (7th Cir. 2000).  In addition, "courts have found releases that are consensual and non-coercive to

be in accord with the strictures of the Bankruptcy Code." Specialty Equip., 3 F.3d at

1047. Accordingly, in In re Specialty Equipment, the Court of Appeals held that all

parties who had voted in favor of a plan were bound by its discharge of claims against a

nondebtor. Id.

Condoning consensual nondebtor releases suggests that § 524(e) does not directly

prohibit plans from including nonconsensual nondebtor releases. Id. ("While a third-

party release . . . may be unwarranted in some circumstances, a [per] se rule disfavoring

all releases in a reorganization plan would be similarly unwarranted, if not a misreading

of the statute"). The addition in 1994 of § 524(g) (an exception to § 524(e) permitting

nondebtor releases in asbestos manufacturer bankruptcies where a trust is established to

pay future personal injury claims) does not imply the contrary. The public law that added

§ 524(g) contains a rule of construction that directs courts not to construe § 524(g) as

modifying "any other authority the court has to issue injunctions in connection with an

order confirming a plan of reorganization." Bankruptcy Reform Act of 1994, Pub. L.

103-394 § 111(b) (Oct. 22, 1994); but see In re Lowenschuss, 67 F.3d 1394, 1401 (9th

Cir. 1995) ("That Congress provided explicit authority to bankruptcy courts to issue

injunctions in favor of the third parties in an extremely limited class of cases reinforces

the conclusion that § 524(e) denies such authority in other, non-asbestos, cases").

Still, nondebtor releases are not favored and must be warranted by the

circumstances of the case. Specialty Equip., 3 F.3d at 1047. A release might be

warranted if the nondebtor is contributing substantially to the reorganization, if the

release is essential to the reorganization, and if the release is closely tailored to the need

for it. E.g., Specialty Equip., 3 F.3d at 1047 (contribution of $10 million in new credit);

In re Drexel Burham Lambert Group, Inc., 960 F.2d 285, 289 (2d Cir. 1992) (release

essential to the reorganization); In re Metromedia Fiber Network, Inc., 416 F.3d 136, 143

(2d Cir. 2005) (broad release not closely tailored to need for release; requiring "truly

unusual circumstances" to establish tailoring); cf. In re Dow Corning Corp., 280 F.3d 648

(6th Cir. 2002) (setting out seven-factor inquiry).  At oral argument, counsel for Airadigm

stated that the release of TDS was justified because (1) TDS was giving "substantial

consideration" under the plan; (2) Airadigm might not be able to obtain the loan from

TDS without the release; (3) the release terms were "narrowly tailored to . . . action that

TDS has taken in this particular case;" and (4) TDS would get similar release terms under

a similar loan outside of bankruptcy.[3]  Transcr. at 17, 23, 24.

     TDS's contribution to Airadigm's reorganization is clearly substantial.  Under the

plan, TDS will lend Airadigm at least $33,009,164.  A loan in that amount is necessary to

consummate the plan.

     In fact, without TDS there likely would be no reorganization.  The other "Buyer"

from the 2000 case has long since dropped out of Airadigm's bankruptcy proceedings,

and there is no evidence that any other source of the necessary credit has been sought or

found.   TDS holds a secured claim for $188,264,000 that must be paid in any

reorganization.  So, without TDS's loan Airadigm would need to find enough cash to

service $221 million in debt.  It is difficult to see where a company that has filed two

bankruptcy cases in the past seven years and projects $9-10 million available per year to

pay its debts (see 2d Am. Discl. Statement Ex. B at 7) would obtain that sort of credit,

although Airadigm has not proved that it would be impossible.  Cf. Galle Decl. at ¶ 10

("Debtor . . . cannot obtain external financing because those claims so greatly exceed the

---

[3] The FCC does not dispute this fourth point.  See Airadigm Resp. to FCC Obj. to 2d Am. Plan at 12.

value of the Debtor's assets and earning capacity").  Despite the weakness of evidence as to TDS's willingness to go forward without the complete release offered in the plan, the proof is adequate that the funding to be supplied by TDS is necessary to the reorganization and that some substantial release is necessary to obtain that funding.  <u>See</u> Transcr. at 25.

Even when permitted, a third party release must be "narrowly tailored."  The plan releases TDS from liability for all conduct "arising out of or in connection with" the 2006 case and the 2006 plan, including conduct it may undertake in the future.  The phrase "in connection with" suggests enormous breadth.  <u>See</u> Fed. R. Bankr. Proc. 2014(a) (2006) (requiring professionals employed in a bankruptcy case to "state . . . all of the person's connections with the debtor, creditors, any other party in interest"); <u>In re Envirodyne Indus., Inc.</u>, 150 B.R. 1008, 1021 (Bankr. N.D. Ill. 1993) (stating that "connections" has no de minimis exception).  The FCC insinuates that it already plans to sue TDS.  Obj. to 3d Am. Plan at 2 ("TDS apparently finds this release critically important; as explained in I.C. below, they have good reason").  I might infer from the FCC's allegations of TDS's bad faith that its planned suit is in some part based on TDS's actions in the 1999 case which remained pending until after this case was filed.  Whatever the merits of such a suit, it appears to me possible that it would arise in connection with this case and be subject to the release in this plan.

Two limiting provisions mitigate the breadth of the release.  First, the release itself discharges TDS from liability "except for willful misconduct."  2006 Plan ¶ 8.1(b).  Second, another provision of the plan states:

> 10.5    **FCC Regulatory Powers.**  Notwithstanding any other provision in this Plan to the contrary, the FCC's exercise of its regulatory rights,

> powers and duties with respect to the Licenses is not enjoined or in any
> way limited, restricted or affected by this Plan; provided, however, that
> this Plan shall govern the treatment of Claims and Liens held by the FCC
> against the Debtor or the Debtor's property.

Id. ¶ 10.5.  While it is not for this court to decide exactly what liabilities these provisions discharge in the absence of a concrete dispute, they leave significant rights to the FCC.  If the possible inference noted above as to the basis of the FCC's potential suit against TDS is correct, the alleged acts could rise to the level of willful misconduct.  Obj. to 3d Am. Plan at 2, 4-14.

It is legitimate for TDS not to want to buy a lawsuit.  Nonetheless, the language of Section 8.1(b) would seem to discharge TDS from liability for conduct that, strictly speaking, was not caused by or directly related to TDS's loan of $33 million.  Of course, on a broader view, all of TDS's conduct in this case is related to the loan, since TDS's primary role in the 2006 case is that of financer.  And, although the relationship between Airadigm and TDS has been close since the formulation of the 2000 plan, there has been no allegation that TDS is an insider or that its conduct would give rise to lender liability. Unlike most disfavored releases such as those to corporate principals, officers, or affiliates, the release of TDS is provided to a third party at arm's length.  It is a close call, but having already found that the release is essential to Airadigm's reorganization, I conclude that the release provided in the plan is appropriate and that its inclusion in the plan does not violate § 524(e).

## IV.    1111(B)(2) ELECTION

While not itself a requirement for confirmation, the FCC's opportunity to elect fully secured treatment for its allowed claim under § 1111(b)(2) triggers special requirements for confirmation.  By treating the creditor's entire allowed claim as secured,

the § 1111(b)(2) election reduces the risk that a chapter 11 debtor will obtain a low judicial valuation of the collateral, bifurcate the secured creditor's claim into secured and unsecured components under § 506(a), then sell the collateral for more than the judicial valuation and reap a windfall.  In re Bloomingdale Partners, 155 B.R. 961, 974 n.7 (Bankr. N.D. Ill. 1993).

The Code does not require that a claim as to which a creditor elects § 1111(b)(2) receive the same treatment as an ordinary secured claim.  For a chapter 11 plan to be confirmed over a secured creditor's objection, the creditor must retain its lien and receive its secured claim plus interest over the life of the plan.  11 U.S.C. § 1129(b)(2)(A)(i).  If the creditor elects treatment under § 1111(b)(2), the creditor is entitled to retain its lien for the value of its entire allowed claim, even though the collateral is worth less.   11 U.S.C. §§ 1111(b)(2), 1129(b)(2)(A)(i).  The future payments that the electing creditor receives under the plan must total at least the allowed claim and must have a present value equal to the value of the collateral as of the effective date of the plan.  11 U.S.C. § 1129(a)(7)(B).

The argument in this case is over the manner in which Airadigm intends to satisfy the confirmation requirements that apply to a § 1111(b)(2) claim.  The FCC likely will not need to make the § 1111(b)(2) election until after confirmation of the plan.  2006 Plan ¶ 5.2(a), (f).  The plan proposes to satisfy any § 1111(b)(2) claim of the FCC with either a U.S. Government or agency's bond, or "annuity contracts issued by an insurance company having an 'A' rating or better from A.M. Best Company or Standard & Poor's."  Id. ¶ 5.2(f)(ii).

If Airadigm provides an instrument that meets the plan specification, the three confirmation requirements for § 1111(b)(2) claims will be met as well. Under the plan, the FCC will retain its lien for the full amount of its allowed claim, $64,219,422.55. Id. ¶ 5.2(f)(iii). The instrument that the plan describes would pay the FCC its allowed claim over time and have a present value of at least the value of the FCC's collateral, $33,009,164.[4] Id.

The FCC argues that receiving deferred cash payments totaling its full allowed claim would not give the FCC the benefit of potential increases in the licenses' value, and that the plan would give Airadigm a windfall if it sold the licenses for more than their judicially established value. Strangely, the FCC also argues that distributing to it a virtually risk free investment would eliminate any of the FCC's benefits that would arise on Airadigm's default. Obj. to 3d Am. Plan at 21-24. These arguments fail because they complain of the exact result that the law requires. True, the payments to the FCC will not increase over the life of the instrument, even if the licenses' value increases. But if Airadigm sells the licenses for more than their current value, the FCC either will continue receiving payments under the instrument or will receive all the proceeds of the sale, up to the amount of its lien. 2006 Plan ¶ 5.2(f)(iii). That is exactly what §§ 1111(b)(2) and 1129 require. And it should go without saying that reducing the risk of default does not violate the Bankruptcy Code.

## V.     PLAN PROPOSED IN GOOD FAITH, NOT BY FORBIDDEN MEANS

Another requirement for confirmation is that "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The

---

[4] At current U.S. Government issue prices, $33,009,164 worth of 10-year Treasury Bonds purchased at their issue would meet these criteria.

Bankruptcy Code does not define "good faith."   Matter of Madison Hotel Assocs., 749

F.2d 410, 424 (7th Cir. 1984).  Instead,

> the term ["good faith"] is generally interpreted to mean that there exists a
> reasonable likelihood that the plan will achieve a result consistent with the
> objectives and purposes of the Bankruptcy Code. . . .  [T]he court looks to
> the debtor's plan and determines, in light of the particular facts and
> circumstances, whether the plan will fairly achieve a result consistent with
> the Bankruptcy Code.  The plan must be viewed in light of the totality of
> the circumstances surrounding confection of the plan. . . .

Id. at 425 (internal marks omitted).  In Matter of Madison Hotel Associates, the U.S.

Court of Appeals for the Seventh Circuit agreed with this court that in assessing the

debtor's good faith it was appropriate to "consider[] the terms of the plan, the history of

the amendments to that plan and the conduct of the debtor and debtor's counsel

throughout the Bankruptcy proceedings."  Id. (internal marks omitted).

Before discussing the the 2006 plan, it is important to clarify certain provisions of

the 2000 plan because the FCC argues that the 2000 plan's substantial consummation

renders the 2006 plan a bad faith proposal.  The FCC broadly cites Article X of the 2000

plan for the proposition that the reason "[t]he 2000 Plan did not address whether any FCC

liens continued [after June 30, 2002 was] because under its alternatives, the FCC would

either be paid in full, or spectrum rights covered by the Licenses would remain with the

FCC due to their non-reinstatement."   Obj. to 3d Am. Plan at 6-7 (internal citations

omitted).  In reality, however, no provision of Article X provides that the licenses would

remain cancelled if the FCC failed to reinstate them by June 30, 2002.  See 2000 Plan ¶

10.2 (returning unlicensed assets to TDS but not mentioning the licenses); ¶ 10.5

(requiring Airadigm to liquidate "[i]f the FCC denies the Petition for Reinstatement," not

if the FCC merely fails to approve it by a certain date [emphasis added]).  The 2000 plan

made no provision for financing the payments to the FCC past June 30, 2002, but it did

not require Airadigm to liquidate or surrender the licenses after that date.  Instead, its

silence meant that Airadigm would need to seek financing on new terms after June 30,

2002, which is exactly what Airadigm did by entering forbearance agreements with TDS.

Although the 2000 plan was substantially consummated, it did not return the

licensed rights to the FCC.  The reason that the 2000 plan was not fully implemented was

that its deadlines passed by their own terms, with no failsafe option for how to finance

Airadigm.  Filing the 2006 case and plan thus was a reasonable effort to tie up ends that

had been left loose by the FCC's inaction.

The FCC argues that the 2006 plan was not proposed in good faith because the

primary treatment under the 2000 plan was perfectly capable of being implemented

(despite FCC inaction on reinstatement), but TDS and Airadigm conspired to delay its

implementation until all creditors other than TDS and the FCC dropped out.  Obj. to 3d

Am. Plan at 7-12.   The FCC claims that TDS filed a petition for reconsideration with the

FCC solely to prevent the reinstatement order from becoming a "Final Order" under the

2000 plan, thereby avoiding an obligation to pay off the FCC.  Id. at 11-12.  But TDS did

not file that petition until late 2003—well after TDS had stopped being obligated to make

the reinstatement loan.  See Petition for Reconsideration and Clarification of TDS, Sept.

8, 2003 (Wireless Telecommunications Bureau Case No. DA-03-2606).  Even if TDS

were responsible for drafting Airadigm's "prepackaged" second chapter 11 plan as the

FCC alleges, cooperation between TDS and Airadigm did not circumvent the 2000 plan

or any liquidation alternative in it.

As additional evidence of collusion the FCC cites a number of instances when

Airadigm took steps which were favorable to TDS, such as pinching Airadigm's other

creditors financially until they sold their seats on Airadigm's Board to TDS. The FCC
seems to be saying that TDS showed a lack of good faith in buying out Airadigm's other
creditors. This raises an initial inquiry into whether the conduct of a non-proponent is
relevant to determining whether a plan was proposed in good faith under § 1129(a)(3).

But we need not decide that question. Even if TDS's conduct is relevant to
Airadigm's good faith, the preponderance of the evidence shows that cooperation
between TDS and Airadigm was not a bad faith attempt to impair the FCC's rights. The
FCC may well be correct that TDS paid off two major claimholders in an effort to
persuade the FCC to settle its claim for less than the amount provided in the 2000 Plan.
Obj. to 3d Am. Plan at 12. However, the record contains no explanation of why the FCC
would be more susceptible to settlement pressure after TDS acquired the claims of two
other creditors. More importantly, even the 2000 plan contemplated that Airadigm would
borrow money from TDS to pay off those two creditors. There is no evidence that TDS's
doing so at a later date was intended to shake down the FCC. TDS Resp. to FCC Obj. to
3d Am. Plan at ¶ 7. TDS's and Airadigm's attempts to settle the FCC's claim were more
likely legitimate efforts to avert a second chapter 11 filing than an attempt to strong-arm
the FCC. TDS Resp. at ¶ 11; FCC Obj. to 3d Am. Plan at 12.

The FCC further argues that the plan was proposed in bad faith because it is
inconsistent with the Bankruptcy Code's policy against modification of a substantially
consummated plan. Section 1127(b) of the Bankruptcy Code prohibits modification of a
substantially consummated plan, providing in part:

> (b) The proponent of a plan or the reorganized debtor may modify such
> plan at any time after confirmation of such plan and before substantial
> consummation of such plan, but may not modify such plan so that such

> plan as modified fails to meet the requirements of sections 1122 and 1123
> of this title.

11 U.S.C. 1127(b); <u>see also</u> 11 U.S.C. § 1141(a) ("the provisions of a confirmed plan

bind the debtor . . . any entity acquiring property under the plan, and any creditor . . .

whether or not the claim or interest of such creditor . . . is impaired under the plan and

whether or not such creditor . . . has accepted the plan").  Sections 1127(b) and 1141(a)

would be meaningless if they could be circumvented simply by filing a second case:

> Once its plan is substantially consummated, the debtor should not be able
> to circumvent or evade its binding responsibilities by filing what is in
> effect a modified plan.  Property has been transferred, management of the
> property has been assumed, and distribution has commenced.  The debtor
> and the creditors have now acted in reliance on the terms of the confirmed
> plan and in the interest of finality, the plan should no longer be subject to
> modification.

<u>In re Adams</u>, 218 B.R. 597, 600-01 (Bankr. D. Kan. 1998).  Still, filing a second case is

sometimes permissible.   <u>In re Jartran</u>, 886 F.2d 859, 866-67 (7th Cir. 1989) ("serial

Chapter 11 filings are permissible under the Code if filed in good faith");[5] <u>see</u> <u>Johnson v.

Home State Bank</u>, 501 U.S. 78, 87, 111 S.Ct. 2150 (1991) (when debtor sought to file

chapter 13 after close of chapter 7 case, interpreting Bankruptcy Code's silence as to

serial filings as permitting them).  So there must be circumstances under which proposing

a second plan would not contravene the spirit of §§ 1127(b) and 1141(a).

Whether such circumstances exist is determined by the proponent's good faith in

proposing the plan.  Most courts hold that good faith requires a refiling debtor to show

---

[5] While the U.S. Court of Appeals for the Seventh Circuit has stated that "serial Chapter 11 filings are permissible under the Code if *filed* in good faith," <u>Jartran</u>, 886 F.2d at 866-67 (emphasis added), the appropriate inquiry in this case is whether the 2006 plan was proposed in good faith.  The Stipulation bars the FCC from arguing that the 2006 case itself was not filed in good faith, as the FCC recognizes.  Obj. to 3d Am. Plan at 16 n.42.  In its most recent objection, the FCC writes: "Debtor argues that the Stipulation prevents the FCC from objecting to the 2006 Plan on the grounds of bad faith because it provided that the FCC would withdraw its objection to the filing of a new case.  This argument mis-characterizes the United States' position, which is that Debtor's plan was formulated and filed in bad faith.  This position is not dependent upon whether the filing of the second bankruptcy case, in itself, was done in bad faith." <u>Id.</u>

"genuine need" or an "extraordinary change in circumstances" before a plan in a second
chapter 11 case will be confirmed.  E.g., In re Tillotson, 266 B.R. 565, 569 (Bankr.
W.D.N.Y. 2001); Adams, 218 B.R. at 601.   "[T]he salient question is whether the
subsequent Chapter 11 case is so related in time or in substance to the earlier case that it
represents a collateral attack on the initial order of confirmation?"  Matter of Bouy, Hall
& Howard & Assocs., 208 B.R. 737, 744 (Bankr. S.D. Ga. 1995); see Jartran, 886 F.2d at
867 ("in some cases the filing of a chapter 11 petition, with an eye toward curing defaults
arising under a previously confirmed chapter 11 plan, is so akin to modifying the
previous plan as to be impermissible") (citing In re Northampton Corp., 39 B.R. 955
(Bankr. E.D. Pa. 1984)) (internal marks omitted).  If the 2006 plan was not intended
primarily to evade responsibilities under the confirmed plan, Jartran suggests that the
Court should "treat [a] reorganized entity as we would any other company."  886 F.2d at
870.

So, why is the 2006 plan necessary?  The 1999 case coincided with the near-apex
of the licenses' value, which has since declined by more than 50 percent.  TDS Resp. to
FCC Obj. to 3d Am. Plan at ¶ 9.  Airadigm reasonably, conservatively, and without
objection projects that it will become a profitable company over the next decade, based
partly on the substantial "build out" it has performed in order to maximize the licenses'
utility and value since 2000.  2d Am. Discl. Statement Ex. B.  The preponderance of the
evidence shows that Airadigm would have almost no chance of surviving without
reorganization in this case.  It also shows that liquidation of the company would result in
less recovery for all parties than reorganization.  Galle Decl. at ¶¶ 5-11, 18, 19.  The
licenses and the "build-out" logically are worth less separately than they are together—in

fact, the build-out would be nearly worthless if not associated with the licenses.  See id.

At the September hearing on valuation, I heard no convincing evidence that the FCC

could obtain more than $33,009,164.00 if it repossessed and reauctioned the licenses.  In

addition, Airadigm has numerous employees and customers, some of whom could lose

emergency 911 service at least temporarily if Airadigm were liquidated.  All of these

circumstances are markedly different from those surrounding the 2000 plan confirmation.

The FCC objects that it "justifiably relied on [the 2000 plan] in various ways."

Obj. to 3d Am. Plan at 18.  Nowhere does it explain those various ways, and none is

obvious.  NextWave made clear that the FCC could not legally foreclose on or cancel the

licenses due to bankruptcy or the nonpayment of dischargeable debts.  There is no

evidence that the FCC did anything or forbore in any way because the 2000 plan was

confirmed.  The FCC's claim of reliance on the 2000 plan has no substance.

Section § 1129(a)(3) also requires that the plan have been proposed "not by any

means forbidden by law."  This phrase historically has been limited to a few means

forbidden by nonbankruptcy law.  It could bar plan provisions that create corporations

that are illegal under state corporation or conflict of interest law, but has seldom done so.

E.g., Matter of Cajun Elec. Power Co-op, 150 F.3d 503, 519 (5th Cir. 1998) (finding no

violation of state law); In re Acequia, Inc., 787 F.2d 1352, 1358 (9th Cir. 1986) (same); In

re Jandous Elec. Constr. Corp., 115 B.R. 46, 51-52 (Bankr. S.D.N.Y. 1990) (same).  It

could prevent confirmation of a plan that proposes a violation of antitrust law, but has

seldom done so.  E.g., Matter of Texas Extrusion Corp., 844 F.2d 1142 (5th Cir.), cert.

denied, 488 U.S. 926 (1988) (finding no violation of antitrust laws).  The FCC argues that

since § 1129(a)(3) would deny confirmation to a plan that violated antitrust law (a

proposition for which it cites no case law), it must deny confirmation to a plan that violates the FCC's regulations.

The FCC argues, as it has throughout the 2006 case, that the money owed it by Airadigm is an inextricable part of the licenses that rises to the level of a federal regulation. This reasoning assumes that the payment condition in the licenses is part of the FCC's regulatory function. But as discussed in detail in my decision in a related adversary proceeding, the Supreme Court in <u>NextWave</u> rejected that assertion. 537 U.S. at 302; <u>see</u> <u>Airadigm Communications, Inc. v. F.C.C.</u>, __ B.R. __, Case No. 06-00155 (Bankr. W.D. Wis. Oct. 27, 2006). Without deciding whether § 1129(a)(3) prevents confirmation of a plan that proposes a violation of FCC regulations, there is no such violation here. Section 1129(a)(3) is therefore satisfied.

## VI.    IMPAIRED CLASS VOTING FOR CONFIRMATION

"If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan [must have] accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). The FCC argues, without citing § 1129(a)(10), that the 2006 Plan artificially impairs Class 6, which consists of unsecured "administrative convenience" claims. Artificial impairment is only a concern if there is no other accepting impaired class. The Plan states that Class 3, consisting of TDS's secured claims, is also impaired. That is not the case here. The FCC argues neither that Class 3 is unimpaired nor that TDS is an insider such that its acceptance would be excluded from § 1129(a)(10). So even if the acceptance of Class 6 were deemed insufficient (which has not been done) the acceptance of the plan by Class 3 meets the requirement of § 1129(a)(10).

## VII.    UNFAIR DISCRIMINATION

One of the requirements for a plan to be confirmed over a creditor's objection is

that "the plan does not discriminate unfairly . . . with respect to each class of claims or

interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1).

The FCC accurately explains that the definition of discrimination for purposes of §

1129(b)(1) is "disparate treatment of classes with similar legal claims against the debtor."

"Section 1129(b)(1) prohibits only 'unfair' discrimination, not all discrimination."  In re

Aztec Co., 107 B.R. 585, 588-89 (Bankr. M.D. Tenn. 1989).  While

> the limits of fairness in this context have not been established . . . it is
> possible at least to lay a framework for measuring the fairness of a
> discrimination in Chapter 11 plans. First, any discrimination must be
> supported by a legally acceptable rationale. . . .  Second, the extent of the
> discrimination must be necessary in light of the rationale.

In re 203 N. LaSalle St. Ltd. P'ship, 190 B.R. 567, 585-86 (Bankr. N.D. Ill. 1995), aff'd,

195 B.R. 692 (N.D. Ill. 1996), aff'd, 126 F.3d 955 (7th Cir. 1997), rev'd on other grounds,

526 U.S. 434 (1999).

The FCC alleges that the 2006 plan treats the class containing its secured claims

unfairly because it pays off the class containing TDS's secured claims over ten years with

interest, while it pays the FCC over a different period with negligible interest.[6]  But the

treatment of which the FCC complains will only occur if the FCC makes the § 1111(b)(2)

election.  Compare 2006 Plan ¶ 5.2(b)-(e) with 2006 Plan ¶ 5.2(f).  The Bankruptcy Code

not only supports but requires different treatment for § 1111(b)(2) claims and ordinary §

506(a) secured claims.  11 U.S.C. § 1111(b)(2) ("notwithstanding § 506(a) . . . such claim

is a secured claim to the extent that such claim is allowed").

---

[6] See note 4, supra, and accompanying text.

Once again, the FCC is complaining about getting exactly what the statute requires that it get.  If the FCC believes that the resulting treatment is unattractive, it can decide not to make the § 1111(b)(2) election.  The Bankruptcy Code does not prohibit in one section what it requires in another.  Absent the election the FCC is treated no worse than (although differently from) other creditors with allowed secured claims.  That discrimination, such as it is, is not unfair to the FCC.

## VIII.   REMAINING REQUIREMENTS OF § 1129

Proofs have been submitted by declaration of the remaining factual predicates to confirmation of the plan.  No objection to those proofs has been made.  As to those requirements of § 1129 not otherwise discussed herein they are, after my consideration, deemed to have been met by the plan.

The submitted order of confirmation will be signed.

###

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **AIRADIGM COMMUNICATIONS, INC.,** | ) | **Case No.  06-10930** |
| | ) | |
| **Debtor.** | ) | |

## THIRD AMENDED PLAN OF REORGANIZATION FOR
## AIRADIGM COMMUNICATIONS, INC. AS OF OCTOBER 6, 2006

GOLDBERG KOHN BELL BLACK
  ROSENBLOOM & MORITZ, LTD.
Ronald Barliant
Alan P. Solow
Kathryn A. Pamenter
55 East Monroe Street
Suite 3700
Chicago, Illinois  60603
Telephone: (312) 201-4000
Facsimile: (312) 332-2196

Attorneys for the Debtor and
Debtor-in-Possession

# **TABLE OF CONTENTS**

Page

ARTICLE I
INTRODUCTION ........................................................................................................... 1

ARTICLE II
DEFINITIONS.............................................................................................................. 1

ARTICLE III
DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS ....................................... 5

ARTICLE IV
TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS ............................................ 6

ARTICLE V
TREATMENT OF CLASSIFIED CLAIMS ........................................................................ 7

ARTICLE VI
MEANS OF IMPLEMENTATION OF THE PLAN ........................................................... 10

ARTICLE VII
EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................................. 11

ARTICLE VIII
RELEASE OF CLAIMS................................................................................................. 11

ARTICLE IX
CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF
THE PLAN .................................................................................................................. 11

ARTICLE X
EFFECT OF CONFIRMATION ..................................................................................... 12

ARTICLE XI
RETENTION OF JURISDICTION BY THE COURT ....................................................... 13

ARTICLE XII
MISCELLANEOUS PROVISIONS................................................................................. 13

## ARTICLE I
## INTRODUCTION

Airadigm Communications, Inc., the Debtor in the above-captioned case, hereby proposes the following plan of reorganization pursuant to § 1121(a) of the Code.

## ARTICLE II
## DEFINITIONS

As used in this Plan, the following terms shall have the respective meanings set forth below:

2.1   "Administrative Expense Claim" means a Claim either allowed under Code § 503(b) by a Final Order or incurred by the Debtor in the ordinary course of business after the Petition Date.

2.2   "Allowed Claim" or "Allowed Equity Interest" is a Claim or Interest allowed under Code § 502.

2.3   "Bankruptcy Court" means the United States Bankruptcy Court for the Western District of Wisconsin (the "Bankruptcy Court"), in which the Case is pending pursuant to a referral of jurisdiction by the United States District Court for the Western District of Wisconsin.

2.4   "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

2.5   "Business Day" means any day other than a Saturday, Sunday or a "legal holiday," as defined in Fed. R. Bankr. P. 9006(a).

2.6   "Case" means In re: Airadigm Communications, Inc., Case No. 06-10930.

2.7   "Claim" has the meaning ascribed to it in Code § 101(5), which states as follows:

(a)   right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(b)   right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

2.8   "Code" means the United States Bankruptcy Code, as amended, 11 U.S.C. §§ 101 *et seq.*

2.9    "Confirmation Date" means the date on which the Confirmation Order is entered by the Court.

2.10    "Confirmation Loan" means the loan to be made by TDS pursuant to Article VI hereof.

2.11    "Confirmation Order" means the order of the Court confirming this Plan.

2.12    "Convenience Claim" means an unsecured Claim that is Allowed in an amount equal to or less than $10,000, or that the holder reduces to $10,000.

2.13    "Court" means:    (a) the Bankruptcy Court, (b) any court having competent jurisdiction to enter final orders or judgments, conduct *de novo* review of issues and withdraw any portion of the Case from the Bankruptcy Court and (c) any court having competent jurisdiction to hear appeals or *certiorari* proceedings from any of the foregoing.

2.14    "Debtor" means Airadigm Communications, Inc., a Wisconsin corporation.

2.15    "Disaggregation" means the splitting of a License into two or more FCC authorizations of lesser frequencies than the original License.

2.16    "Effective Date" has the meaning set forth in Section 9.2 hereof.

2.17    "Equity Interest" means common stock or preferred stock in the Debtor authorized or issued before the Confirmation Date, and any rights to acquire or dispose of any such stock.

2.18    "FCC" means the Federal Communications Commission, an agency of the United States Government.

2.19    "FCC Adversary Proceeding" means that certain adversary proceeding commenced in the Bankruptcy Court on June 30, 2006, entitled Airadigm Communications, Inc. v. Federal Communications Commission, Case No. 06-155-11, and any proceedings related thereto in any Court.

2.20    "FCC Payment Date" means either (a) the tenth Business Day after the later of (i) the date the Confirmation Order becomes a Final Order; (ii) the date the order or judgment in the FCC Adversary Proceeding determining the validity, priority and extent of the FCC's Liens on the Licenses becomes a Final Order; (iii) the date the order or judgment determining the amounts of all Class 2 Claims becomes a Final Order; (iv) the date the Debtor obtains all necessary FCC approvals and any other regulatory approvals, on usual and customary terms and conditions, that may be required to effectuate this Plan and such approval or approvals become a Final Order or Final Orders; and (v) the last date on which the holder of a Class 2 Claim may make the election described in Code § 1111(b) pursuant to § 5.2(f) of this Plan, or (b) such earlier date as the Reorganized Debtor and TDS may agree.

2

2.21   "Final Order" means: (a) an order or judgment of a Court relating to the Case that has neither been stayed nor is subject to appeal, *de novo* review or *certiorari* proceeding, and as to which no appeal, *de novo* review or *certiorari* proceeding is pending; and (b) as to an order of the FCC, an order that is no longer subject to appeal, review or reconsideration pursuant to 47 U.S.C. §§ 402 and 405, and 47 C.F.R. §§ 1.106, 1.108, 1.110, 1.113, 1.115 and 1.117, and as to which no such appeal, review or reconsideration is pending.

2.22   "Licenses" means the Personal Communications Services licenses granted by the FCC and held by the Debtor as of the Petition Date, consisting of 13 C-Block and two F-Block Licenses covering Basic Trading Areas ("BTAs") in Wisconsin, Iowa and the Upper Peninsula of Michigan as further described in Section 3.3 hereof.

2.23   "Lien" has the meaning ascribed to it in Code § 101(37), which states as follows:   "charge against or interest in property to secure payment of a debt or performance of an obligation."

2.24   "MHz Pops" means for a particular License the number of the MHz frequency included in such license multiplied by the total population covered by such license, as shown in Section 3.3 hereof.

2.25   "Miscellaneous Secured Claims" means all Secured Claims not otherwise specifically provided for in this Plan.

2.26   "Partial License" means that portion of a License remaining after Partition or Disaggregation.

2.27   "Partition" means the division of a License into two or more geographic areas, each with a separate FCC authorization.

2.28   "Payment Date" means the fifth Business Day after the Confirmation Date, or with respect to a specific Claim, the fifth Business Day after the date on which such Claim becomes an Allowed Claim pursuant to a Final Order, whichever is later, and is the date on which only Administrative Expense Claims, Priority Claims, Miscellaneous Claims and Convenience Claims will be paid.

2.29   "Petition Date" means May 8, 2006, the date on which the Debtor filed its petition for relief commencing this Case.

2.30   "Plan" means this Third Amended Plan of Reorganization for Airadigm Communications, Inc. dated as of October 6, 2006.

2.31   "Priority Claim" means a Claim, other than an Administrative Expense Claim, entitled to priority under § 507 of the Code.

2.32   "Reorganized Debtor" means the Debtor after the Effective Date.

3

2.33    "Retained Pro-Rata Portion" means, with respect to a payment for a Partial License that the Reorganized Debtor elects to retain, the fraction determined as follows: 1) the MHz Pops with respect to the Partial License retained by the Debtor, divided by 2) the MHz Pops with respect to the entire License from which the Partial License is Partitioned or Disaggregated.

2.34    "Secured Claim" means any Claim that is secured by a Lien on property of the Debtor's estate that is (a) valid, perfected and enforceable under applicable law and (b) not avoided under the Code or applicable non-bankruptcy law, but only to the extent of the value of such Lien; provided, however, if the holder of such Claim makes the election permitted under Code § 1111(b)(2), then the Claim is secured by such Lien to the extent of the allowed amount of such Claim.

2.35    "Statement of Election" means the written statement of the Debtor setting forth which Licenses and Partial Licenses the Debtor will retain.

2.36    "Surrendered Pro-Rata Portion" means, with respect to a credit for a Partial License surrendered by the Debtor to the FCC, the fraction determined as follows: 1) the MHz Pops with respect to the Partial License surrendered by the Debtor to the FCC, divided by 2) the MHz Pops with respect to the entire License from which the Partial License is Partitioned or Disaggregated.

2.37    "TDS" means Telephone and Data Systems, Inc., a Delaware corporation.

2.38    "TDS Purchased Claim 1" means the Claim originally held by Ericsson, Inc. and assigned to TDS on March 11, 2004, consisting of Claim Nos. 84 and 90, and the Class 2 Claim under The 2000 Plan. Claim No. 84 was filed with the Court on March 9, 2000, in the amount of $3,257,404.70. Claim No. 90 was filed with the Court on March 9, 2000, in the amount of $61,253,363.06. The Class 2 Claim under The 2000 Plan was allowed in the amount of $71 million. TDS was substituted as the holder of this Claim by an order of the Court dated May 13, 2004.

2.39    "TDS Purchased Claim 2" means the Claim originally held by Oneida Enterprise Development Authority of the Oneida Tribe of Indians of Wisconsin and assigned to TDS on July 8, 2004, consisting of Claim No. 89, represented as the Class 3 Claim under The 2000 Plan. Claim No. 89 was filed with the Court on March 10, 2000, in the amount of $40 million. The Class 3 Claim under The 2000 Plan was allowed in the amount of $40 million. TDS was substituted as the holder of this Claim by an order of the Court dated August 4, 2004.

2.40    "WWCC" means Wisconsin Wireless Communications Company, a Wisconsin corporation.

2.41    "The 2000 Plan" means that Plan of Reorganization of Airadigm Communications, Inc. dated October 13, 2000, as confirmed by the Court in Case No. 99-33500-11.

Except as otherwise stated in this Plan, all terms used in this Plan that are defined in the Code have the meanings therein ascribed, and this Plan shall be construed in accordance with the rules of construction contained in Code § 102.

# ARTICLE III
## DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS

Claims and interests are hereby designated in the following classes:

3.1    Unclassified Claims consist of all Administrative Expense Claims.

3.2    Class 1 Claims consist of all Priority Claims.

3.3    Class 2 Claims consist of the following Claims of the FCC only if and to the extent that the Court determines by a Final Order in the FCC Adversary Proceeding that such Claims are Secured Claims:

| SUB-CLASS | BTA | MARKET NAME | FREQ. | MHz | MHz POPs | VALUE OF LICENSE* |
|---|---|---|---|---|---|---|
| 2A | 18 | Appleton, Wisconsin | C | 30 | 13,570,650 | $3,906,730 |
| 2B | 70 | Cedar Rapids, Iowa | C | 30 | 8,684,760 | $2,233,396 |
| 2C | 118 | Dubuque, Iowa | F | 10 | 1,797,070 | $502,986 |
| 2D | 123 | Eau Claire, Wisconsin | C | 30 | 5,862,240 | $1,696,320 |
| 2E | 148 | Fond du Lac, Wisconsin | C | 30 | 2,918,880 | $910,215 |
| 2F | 173 | Green Bay, Wisconsin | C | 30 | 10,673,580 | $3,171,140 |
| 2G | 216 | Janesville, Wisconsin | C | 30 | 7,381,980 | $2,471,330 |
| 2H | 234 | La Crosse, Wisconsin | C | 30 | 9,611,010 | $2,618,733 |
| 2I | 272 | Madison, Wisconsin | C | 30 | 20,462,940 | $7,767,768 |
| 2J | 276 | Manitowoc, Wisconsin | C | 30 | 2,486,610 | $774,894 |
| 2K | 279 | Marinette, Wisconsin | F | 10 | 687,100 | $436,956 |
| 2L | 417 | Sheboygan, Wisconsin | C | 30 | 3,379,380 | $1,169,326 |
| 2M | 432 | Stevens Point, Wisconsin | C | 30 | 6,438,510 | $1,707,916 |
| 2N | 462 | Waterloo, Iowa | C | 30 | 7,993,470 | $1,607,621 |
| 2O | 466 | Wausau, Wisconsin | C | 30 | 7,321,440 | $2,033,830 |
| * Based on valuation determination pursuant to Court Order entered on October 4, 2006 | | | | | | |

3.4    Class 3 Claims consist of the following sub-class Secured Claims of TDS:

(a)    Sub-Class 3A consists of all Secured Claims of TDS related to the loan made pursuant to Sections 6.2 and 6.3 of The 2000 Plan;

5

(b)   Sub-Class 3B consists of all Secured Claims of TDS related to the construction loans made pursuant to Section 6.8 of The 2000 Plan.

(c)   Sub-Class 3C consists of all Secured Claims of TDS related to the TDS Purchased Claim 1.

(d)   Sub-Class 3D consists of all Secured Claims of TDS related to the TDS Purchased Claim 2.

3.5   Class 4 Claims consist of all Miscellaneous Secured Claims.

3.6   Class 5 Claims consist of all unsecured Claims other than Convenience Claims, including the Claims of the FCC and TDS identified in Sections 3.3 and 3.4 of this Plan to the extent that they are not Secured Claims.

3.7   Class 6 Claims consist of all Convenience Claims.

3.8   Class 7 consists of all Equity Interests in the Debtor.

## ARTICLE IV
## TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS

4.1   **Payment of Administrative Expense Claims — Generally**. Administrative Expense Claims will be paid in full as follows, unless the holder of any such Claim, the Reorganized Debtor and TDS otherwise agree:

(a)   **Professional Fees and Expenses and Administrative Expense Claims Incurred Outside the Ordinary Course of Business**.   Administrative Expense Claims for compensation and expenses awarded under Code § 330 and other Administrative Expense Claims arising outside the ordinary course of business will be paid in full on the Payment Date. Applications and requests for the allowance of such Claims must be filed, and notice given in accordance with applicable Bankruptcy Rules, no later than 30 days after the Confirmation Date or such later date as the Bankruptcy Court approves.

(b)   **Ordinary Course Administrative Expenses**. Administrative Expense Claims arising in the Debtor's ordinary course of business will be paid without further order of the Court in the Debtor's ordinary course of business and according to the terms of the agreement giving rise to such Claim.

4.2   **U.S. Trustee Fees**. Fees of the United States Trustee, payable under 28 U.S.C. § 1930, shall continue to be payable on their respective due dates in accordance with Code § 1129(a)(12).

6

## ARTICLE V
## TREATMENT OF CLASSIFIED CLAIMS

5.1    **Class 1 (Priority Claims)**.  Class 1 Claims are **unimpaired**.  On the Payment Date, or such other date as the Reorganized Debtor, TDS and the holder agree, the Reorganized Debtor will pay the holder of each Allowed Class 1 Claim the full amount of such Claim, plus any interest that may be due, in cash.

5.2    **Class 2 (FCC Secured Claims)**.  Class 2 Claims are **impaired**. Class 2 Claims shall be allowed as Secured Claims in the amounts determined by the Court, and the Reorganized Debtor will satisfy such Class 2 Claims as follows, unless the holder of any such Claim, the Reorganized Debtor and TDS otherwise agree:

(a)    **Delivery of Statement of Election.**  The Debtor may deliver the Statement of Election to the FCC any time after the Confirmation Date, but must do so no later than the fifth Business Day after the later of (i) the date the Confirmation Order becomes a Final Order; (ii) the date the order or judgment in the FCC Adversary Proceeding determining the validity, priority and extent of the FCC's Liens on all the Licenses becomes a Final Order; (iii) the date the order or judgment determining the amount of all Class 2 Claims becomes a Final Order; and (iv) the date the Debtor obtains all necessary FCC approvals and any other regulatory approvals, on usual and customary terms and conditions, that may be required to effectuate this Plan and such approval or approvals become a Final Order or Final Orders; provided, however the Debtor will not elect to retain a Partial License unless the Debtor has obtained all necessary FCC approvals and any other regulatory approvals for the Partition or Disaggregation.

(b)    **Treatment Regarding Retained Licenses (other than Partial Licenses).**  With respect to each License that the Debtor elects to retain, the Reorganized Debtor will pay on the FCC Payment Date to the holder of the Class 2 Claim corresponding to such License, the full amount in cash of such Secured Claim.  Such payment amount shall not include interest, except as provided in Code § 506(b).

(c)    **Treatment Regarding Retained Partial Licenses.**  With respect to each Partial License that the Debtor elects to retain, the Reorganized Debtor will pay, on the FCC Payment Date to the holder of the Class 2 Claim corresponding to the License from which the Partial License was Partitioned or Disaggregated, an amount in cash equal to the Retained Pro Rata Portion multiplied by the Class 2 Claim.  Such payment amount shall not include interest, except as provided in Code § 506(b).

(d)    **Treatment Regarding Surrendered Licenses (other than Partial Licenses).**  With respect to each License that the Debtor does not elect to retain as set forth in the Statement of Election, the Reorganized Debtor will surrender all of its rights and interests in that License on the FCC Payment

7

Date to the holder of the Class 2 Claim secured by that License in full satisfaction of that Claim.

      (e)    **Treatment Regarding Surrendered Partial Licenses.** With respect to each Partial License that the Debtor does not elect to retain as set forth in the Statement of Election, the Reorganized Debtor will surrender all of its rights and interests in that Partial License on the FCC Payment Date to the holder of the Class 2 Claim secured by the License from which the Partial License was Partitioned or Disaggregated and shall receive a credit against that Claim in an amount equal to the Surrendered Pro Rata Portion of that Claim.

      (f)    **Treatment in Event of Section 1111(b) Election.** The holder of a Class 2 Claim corresponding to a License or Partial License that the Debtor elects to retain may make the election described in Code § 1111(b) to treat such Class 2 Claim as a Secured Claim no later than the fifth Business Day following the date on which the Debtor delivers the Statement of Election.  (With regard to a Class 2 Claim relating to a retained Partial License, the amount of such Claim shall be the amount of the original Claim not satisfied by the Surrendered Pro Rata Portion of that Claim.)  If any such holder does so elect treatment under § 1111(b), then, in lieu of the payments described in §§ 5.2(b) and (c) above, the Reorganized Debtor will satisfy such Class 2 Claim as follows:

      (i)    Such holder will retain its Lien to the extent of the allowed amount of the Secured Claim until such Secured Claim is paid in full without interest.

      (ii)    On the FCC Payment Date, on account of the Class 2 Claim with respect to which such election is made, the Reorganized Debtor will purchase in its sole discretion either (x) securities representing either an obligation of the United States or an obligation guaranteed by an agency of the United States and backed by the full faith and credit of the United States, or (y) annuity contracts issued by an insurance company having an "A" rating or better from A.M. Best Company or Standard & Poor's, in an amount and on such terms that the holder of such Class 2 Claim will receive, in no more than 30 years, deferred cash payments totaling at least the full amount of such Class 2 claimholder's Secured Claim, of a value, as of the Effective Date, of the Lien that secures such Secured Claim.  The securities or annuity contracts will be for the benefit of the holder of such Class 2 Claim, but in the name of the Reorganized Debtor.

      (iii)    When the holder of the Class 2 Claim has received the payments required by § 5.2(f)(ii), above (either from the proceeds of such securities or annuity contracts, the proceeds of a sale of the

8

corresponding License or Partial License, direct payment by the Reorganized Debtor or any assignee, designee or successor of the Reorganized Debtor, or otherwise), then the Class 2 Claim will be satisfied in full, and such holder will have no further right or interest in or to such securities or annuity contracts, which will then become the exclusive property of the Reorganized Debtor.

(g)    **Release of Liens.**  The holder of a Class 2 Claim will retain its Lien until such Claim is satisfied in accordance with the foregoing, whereupon, without any further action being necessary, the Lien securing such Claim will be released, and the Reorganized Debtor will hold any corresponding License or Partial License that it has retained, free and clear of all liens, claims or encumbrances.  At such time, the Reorganized Debtor may make any filings that it determines appropriate to reflect such termination of such Lien.

5.3    **Class 3 (TDS Secured Claims).**  Class 3 Claims are **impaired**.  The holder of the Class 3 Claims will retain its Liens until such Claims are satisfied in full, at which time such Liens will be released.  The Reorganized Debtor will satisfy the Class 3 Claims in full with payments as follows:

(a)    The Class 3 Claims will bear interest on the allowed amount of such Claims from and after the FCC Payment Date at the rate of 10% per annum (or such other rate as the Debtor and TDS agree on or before the Confirmation Date).

(b)    For the first three (3) years after the FCC Payment Date, the Reorganized Debtor will pay only accrued interest in six (6) semi-annual payments, making the first such payment on the first day of the sixth month following the month in which the FCC Payment Date occurs and each of the next five (5) interest payments on the first day of each sixth month thereafter.

(c)    Beginning on the first day of the forty-second month following the month in which the FCC Payment Date occurs, the Reorganized Debtor will make equal semi-annual installment payments of principal plus accrued interest amortized over a term of eighty-four (84) months, with a balloon payment on the first day of the one-hundred-second month after the month in which the FCC Payment Date occurs of the entire unpaid balance of principal and accrued interest. At such time, the Reorganized Debtor may make any filings that it determines appropriate to reflect such termination of the Liens securing Class 3 Claims.

5.4    **Class 4 (Miscellaneous Secured Claims)**.    Class 4 Claims are **unimpaired**.  On the Payment Date, the Reorganized Debtor will at its election either: (i) pay in cash the balance due and owing on each Allowed Class 4 Claim plus any interest that may be due, or (ii) surrender the collateral securing the Claim to the holder of the Allowed Class 4 Claim, in full and complete satisfaction of said Class 4 Claim.  Holders of Allowed Class 4 Claims will retain their Liens until such payment or surrender, at which time, such Liens will be released without any further action.

9

5.5    **Class 5 (Unsecured Claims other than Convenience Claims)**. Class 5 Claims are **impaired**.   On the later of (a) the FCC Payment Date and (b) the date their Claims are allowed, holders of Allowed Class 5 Claims will receive shares of voting, common stock in the Reorganized Debtor.  The Reorganized Debtor, in full satisfaction of such Claims, will issue (i) one share of common stock for each $500,000 of each such Claim, and (ii) fractional shares for the balance of any such Claim that is not satisfied by the issuance of whole shares or for any such Claim that is allowed in an amount less than $500,000.

5.6    **Class 6 (Convenience Claims)**.   Class 6 Convenience Claims are **impaired**.  On the Payment Date, the Reorganized Debtor will pay, in cash, the full amount of each Allowed Class 6 Claim, without interest.

5.7    **(Class 7) (Equity Interests)**.  Class 7 Interests are **impaired**.   On the FCC Payment Date, all Equity Interests will be canceled, and the rights and interests of all holders of Equity Interests will be terminated.

## ARTICLE VI
## MEANS OF IMPLEMENTATION OF THE PLAN

6.1    **The Confirmation Loan**.  If the Reorganized Debtor does not have sufficient cash to make any cash payment required by Sections 5.2(b), 5.2(c) and 5.2(f)(ii) (to purchase securities or annuity contracts in accordance with Section 5.2(f)) of this Plan, then, on the FCC Payment Date, TDS or its designee will make the Confirmation Loan in the amounts necessary to make such cash payment, provided all conditions to such payment have been satisfied.  The obligation of TDS to make the Confirmation Loan shall be conditioned on, and subject to, the delivery of the Statement of Election and filing of such applications as required under Section 6.4 of this Plan, in form and substance reasonably satisfactory to TDS.

6.2    **Terms of the Confirmation Loan**.  The amount of the Confirmation Loan will be added to the Allowed Class 3 Claims, will be secured by the same Liens as secure those Claims, and will be paid on the same terms as provided in Section 5.3 of this Plan.

6.3    **Conversion of Debt to Equity**.  The Reorganized Debtor will take all steps necessary to cause the authorization and issuance of sufficient shares of common stock in the Reorganized Debtor to satisfy Class 5 Claims in accordance with Section 5.5 of this Plan.  Such transfers are intended to be the type of transfer exempt from registration under Code § 1145(a)(1)(A).

6.4    **Applications for regulatory approval**.   As soon after the Confirmation Date as practicable, the Debtor will file such applications as may be required to obtain any FCC or other regulatory approvals necessary to implement this Plan.

## ARTICLE VII
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1    **Treatment of Contracts and Leases.**    Except to the extent the Bankruptcy Court orders otherwise on motion of the Debtor filed no later than 30 days after the Effective Date, all executory contracts and unexpired leases of the Debtor will be deemed assumed under Code § 365 as of the thirty-first day after the Effective Date.  If any party to such a contract or lease wishes to object to such assumption, or alleges that there is a default under such contract or lease that must be cured under Code § 365(b), that party must file an objection no later than 30 days after the Effective Date.  If no such objection is filed by that date, that party's objection or allegation of a default will be forever barred and may not be asserted in any subsequent proceeding in any forum.

## ARTICLE VIII
## RELEASE OF CLAIMS

8.1    General Release of Claims.

(a)    On the Effective Date, any and all of the Debtor's claims, rights, causes of action and remedies under Code §§ 541, 544, 545, 547 through 551, and 553 will be released and barred, and no proceeding under any such section shall be commenced; provided, however, that any such proceeding commenced by the Debtor before the Effective Date is excepted from this paragraph of this Plan and is retained and may be enforced by the Reorganized Debtor.   Without limiting the foregoing, the FCC Adversary Proceeding is not affected by this Plan.

(b)    On the Effective Date, any and all Claims of the Debtor against TDS shall be released and forever discharged.  Except as expressly provided in this Plan, as of the Effective Date, neither TDS, its affiliates, parents or subsidiaries, nor any of its respective members, shareholders, officers, directors, employees, agents, attorneys, or professionals shall have or incur any liability to the Debtor, the Reorganized Debtor, or to any holder of any Claim or equity interest for any act or omission arising out of or in connection with the Case, the confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or property to be distributed under this Plan, except for willful misconduct.

## ARTICLE IX
## CONDITIONS TO CONFIRMATION AND
## EFFECTIVENESS OF THE PLAN

9.1    **Conditions Precedent to Confirmation.**   Confirmation of this Plan will not occur unless the Debtor and TDS have approved this Plan and the form of the Confirmation Order.

9.2    **Effective Date.**   This Plan will be effective, and the Effective Date will occur, on the eleventh day (or, if that is not a Business Day, the first Business Day thereafter)

11

after the Confirmation Date, unless the Confirmation Order has been stayed before such eleventh day, in which event the Effective Date will be the first Business Day after such stay is terminated.

# ARTICLE X
# EFFECT OF CONFIRMATION

10.1 **Re-vesting of Assets**. Except as expressly provided in this Plan, on the Confirmation Date, all property of the Debtor's estate will vest in the Reorganized Debtor pursuant to Code § 1141(b), free and clear of all liens, claims and encumbrances.

10.2 **Extinguishment of Liens**. Except as expressly provided in this Plan, all Liens on property of the Debtor's estate will be extinguished on the Confirmation Date.

10.3 **Discharge**. Except as expressly provided in this Plan, on the Confirmation Date, pursuant to Code § 1141(b), the Debtor will be discharged from all Claims and all Administrative Expense Claims, to the fullest extent authorized by the Code.

10.4 **Discharge Injunction**. Except as provided in Sections 10.5 and 10.6 hereof, and in addition to the injunctions provided in § 524(a) of the Code, from and after the Confirmation Date, holders of Claims against the Debtor or its assets shall be enjoined from: (a) commencing or continuing any action or proceeding or employing process against the Debtor, the Reorganized Debtor, the property of either of them, or the holders of equity interests of either of them, in an attempt to obtain or realize partial or full satisfaction of any Claim; (b) enforcing or seeking to enforce any such Claim, or taking any steps which will lead to the enforcement of any such Claim against Debtor, the Reorganized Debtor, the property of either of them, or the holders of equity interests of either of them; (c) seeking to set off or recoup any such Claim against any pre-petition or post-petition obligations owed to Debtor, the Reorganized Debtor or a successor in interest of Debtor; (d) seeking to create, perfect or enforce any Lien against property of the Debtor or the Reorganized Debtor or the holders of equity interests of either of them; and (e) taking all other acts against the Debtor, the Reorganized Debtor, the property of either of them, or the holders of equity interests of either of them, including but not limited to those acts described in Code § 362(a).

10.5 **FCC Regulatory Powers**. Notwithstanding any other provision in this Plan to the contrary, the FCC's exercise of its regulatory rights, powers and duties with respect to the Licenses is not enjoined or in any way limited, restricted or affected by this Plan; provided, however, that this Plan shall govern the treatment of Claims and Liens held by the FCC against the Debtor or the Debtor's property.

10.6 **Plan Enforcement**. Notwithstanding Section 10.4 hereof, after the Confirmation Date, the holder of an Allowed Claim may enforce its rights under this Plan against the Reorganized Debtor and the assets of the Reorganized Debtor.

## ARTICLE XI
## RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

After the Confirmation Date, the Bankruptcy Court will retain jurisdiction for all appropriate purposes to the extent permitted by applicable law, including but not limited to the following:

11.1   To consider any modification to this Plan, or to correct any defect, cure any omission, or reconcile any inconsistency in this Plan or in the Confirmation Order, to the extent necessary to carry out the purposes and intent of this Plan.

11.2   To hear and determine any objections to the allowance of Claims and requests for estimation of Claims.

11.3   To hear and determine any and all applications, adversary proceedings, motions and other contested matters not resolved in this Plan.

11.4   To hear and determine any and all applications for compensation of professional services and disbursements and any other similar fees incurred prior to the Confirmation Date.

11.5   To enforce the terms and provisions of payments, rights and interests required or created by this Plan, or by earlier orders of the Court.

11.6   To enter any order necessary to consummate, interpret, and effect the provisions of this Plan and the Confirmation Order, or as may otherwise be required by the Code.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

12.1   **Retiree and Other Employee Benefits**.  No employee benefits will be affected by this Plan.  To the extent the Debtor is obligated to provide retiree benefits, as that term is defined in Code § 1114, the Reorganized Debtor will continue to provide such benefits for the duration of the period that the Debtor has obligated itself to provide such benefits.

12.2   **Prohibition on Issuance of Nonvoting Equity Securities**.   The Debtor's charter shall be amended, if necessary, so that it includes a provision prohibiting the issuance of non-voting equity securities.  There is only one class of securities that possesses voting power.

12.3   **Governing Law.**  Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other federal laws are applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with this Plan, the construction, implementation and enforcement of this Plan and all rights and obligations arising under this Plan shall be governed by, and construed and enforced in

13

accordance with, the laws of the State of Wisconsin, without giving effect to conflicts-of-law principles which would apply the law of a jurisdiction other than the State of Wisconsin or the United States of America.

      12.4    **No Admissions or Adjudications.**    Notwithstanding anything in this Plan to the contrary, nothing contained in this Plan shall be deemed an admission by the Debtor with respect to any matter set forth herein, including, without limitation, liability on any Claim or interest or the propriety of any classification of any Claim or interest.  Except as expressly stated in this Plan, nothing in this Plan is an adjudication of any disputed Claim, Secured Claim or the FCC Adversary Proceeding.

      12.5    **Debtor's Obligations Limited to Plan.**    This Plan and, to the extent applicable, the Bankruptcy Code set forth all of the Debtor's obligations and undertakings relating to the matters dealt with in this Plan, and this Plan supersedes all prior discussions and documents.    The Debtor is not bound by any statements, terms, warranties, understandings, or representations with respect to the subject matter of this Plan, other than as expressly provided for in this Plan.

14

Respectfully submitted this 6th day of October, 2006.

**AIRADIGM COMMUNICATIONS, INC.**

By _Robert J Galle_

Robert J. Galle, Chief Executive Officer

GOLDBERG KOHN BELL BLACK
  ROSENBLOOM & MORITZ, LTD.
Ronald Barliant
Alan P. Solow
Kathryn A. Pamenter
55 East Monroe Street
Suite 3700
Chicago, Illinois 60603
Telephone: (312) 201-4000
Facsimile: (312) 332-2196

15