IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

In re:

AIRADIGM COMMUNICATIONS, INC.,                          (Chapter 11)

        Debtor.                                        Case No. 06-10930

---

MEMORANDUM DECISION

---

The Federal Communications Commission ("FCC") and Telephone & Data Systems, Inc. ("TDS") are the two principal secured (more precisely, under-secured) creditors in this chapter 11 case. The FCC has objected to all three claims TDS has filed. TDS has moved for partial summary judgment on the FCC's objections to Claim 14.

TDS made the three loans which comprise Claim 14 pursuant to a confirmed plan ("the 2000 plan") in Airadigm's prior chapter 11 case ("the 1999 case"). The "Confirmation Loan" paid off almost all creditors in the 1999 case other than the FCC. 2000 Plan ¶ 6.2. The Confirmation Loan was secured by all of Airadigm's assets other than Airadigm's FCC-issued licenses. ¶ 6.3. The "Working Capital Loan" was "a separate line of credit loan facility to be used by the Debtor for its ongoing working capital needs," up to $600,000 per month. ¶ 6.6. It was "secured" by a negative pledge of Airadigm's non-license assets. Id. The "Construction Loan" was a purchase money secured loan "for the purpose of financing the Debtor's acquisition and construction of additional cell sites." ¶ 6.8. The remainder of Claim 14 consists of interest, which the 2000 plan stated would accrue at 8.5 percent annually. ¶¶ 6.3, 6.6, 6.8. The 2000 plan

1

and the loan agreements provided that Airadigm would repay all three loans by surrendering its non-license assets, in full satisfaction of the loans including interest thereon.

The FCC's principal complaint about Claim 14 is that TDS and Airadigm never intended the loans to be repaid. As evidence, the FCC refers to the pertinent loan documents, which provided no means of payment except surrender of the collateral. The FCC contends that TDS paid for an equity interest in Airadigm rather than making a loan. The FCC argues that the Court should recharacterize Claim 14 as an equity interest. It cites several cases which have recognized a doctrine called "recharacterization," even though the Bankruptcy Code expressly does not do so. The FCC also objects to the amount of Claim 14, arguing that TDS overvalues the secured portion of the claim and that Claim 14 should not include any interest because none was ever intended to be paid under the 2000 plan.

TDS's motion for summary judgment asks the Court to overrule both aspects of the FCC's objection to Claim 14. First, TDS argues that the FCC's request to recharacterize Claim 14 as an equity interest is inappropriate on the undisputed facts of this case. Second, TDS seeks a determination that the secured portion of Claim 14 is worth $23.1 million. Jurisdiction over these requests is proper under 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O).

A threshold question is whether the FCC can even object to Claim 14 under a stipulation signed by TDS, the FCC, and Airadigm. Airadigm filed this chapter 11 case while the 1999 case was still formally open. The FCC objected to the issuance of a final decree in the 1999 case, and to the filing of this case. On June 6, 2006, the Court approved a stipulation among these three parties, as they modified it verbally at the time of approval. The written portion of the stipulation provided in part:

> 1. Except as otherwise specifically set forth in this Stipulation, all of the rights of Airadigm as debtor, and the FCC and TDS as

2

creditors, under the 2000 Plan, including their respective rights as holders of the Allowed Claims they hold pursuant to the 2000 Plan . . . are in no way prejudiced by closing the 1999 Bankruptcy Case and proceeding with the 2006 Bankruptcy Case.

2.      . . . the claims of TDS arising from its advances of funds in accordance with the 2000 Plan shall be allowed in the 2006 Bankruptcy Case in the amount of such loans with interest to the extent provided in the 2000 Plan.

. . .      4.      All other rights of the parties hereto (including, without limitation, the right of the FCC and TDS to seek the inclusion and allowance of interest on their Allowed Claims (including assigned Allowed Claims) in the 2006 Bankruptcy Case) are expressly reserved.

Stipulation of Claims of the FCC and TDS, In re Airadigm Communications, Inc., Case No. 99-33500 (Docket No. 553 Bankr. W.D. Wis. June 6, 2006).

The parties obscured these relatively clear statements when they orally modified the stipulation on the record. They clarified that the stipulation did not affect three open issues: (1) it did not waive any party's "right to claim interest accrued on those claims since their allowance;" (2) it did not resolve "questions with respect to the nature or extent of security for various claims;" and (3) the FCC's simultaneous withdrawal of its objection to entry of a final decree in the 1999 case "does not speak to any of the substantive arguments that were put into . . . the application to dismiss or in any way is conceding to the arguments that were made by Airadigm in their response and position statement." Transcr. of Prelim. Hearing on 6/6/06, In re Airadigm Communications. Inc., Case No. 99-33500, at 3-5 (Docket No. 555 Bankr. W.D. Wis. June 12, 2006). In addition, counsel for TDS stated that "As to [interest and extent of security] *and other unresolved issues*, the parties do not intend by this stipulation to waive a right as might be appropriate or as might be authorized under the [C]ode or the rules to pursue disputes, should they so choose in the future." Id. at 6 (emphasis added). One of Airadigm's attorneys stated that "Paragraph 4 is broad. It reserves all rights." Id. at 4. Three times during the hearing on the

3

stipulation, I invited the attorneys to submit a revised written stipulation rather than rely on the oral modifications. Id. They declined, apparently concurring in all of the modifications.

These unrebutted "clarifications" on the record rendered the stipulation confusing and contradictory. I find in it no clear prohibition – whether as a matter of contract law, waiver, or estoppel – on the FCC's objections to TDS's claims. To the contrary, the stipulation permits some objections by the FCC, because it reserves TDS's right "to seek the inclusion and allowance of interest," Stip. ¶ 4, a reservation that logically extends to the FCC's right to object to such a request. The attorneys' sweeping declarations that they were not waiving their right to pursue disputes over "other unresolved issues" and that they were "reserv[ing] all rights" show no intent to limit the FCC's objections to the issue of interest. Those statements undercut the clear dictate in the written portion of the stipulation that "the claims of TDS arising from its advances of funds in accordance with the 2000 Plan shall be allowed in the 2006 Bankruptcy Case." Id. ¶ 2. At TDS's request, I previously held that similar language in the stipulation did not prohibit TDS from objecting to the FCC's claims. Prelim. Transcr. of Final Hearing on Objection to Claims No. 21-34 of FCC, In re Airadigm Communications, Inc., Case No. 06-10930 (Docket Nos. 385-386 Bankr. W.D. Wis. Feb. 23, 2007). I still do not understand exactly what the parties intended when they entered the stipulation, but its unclear and sometimes contradictory language prevents me from finding in it any intent to preclude them from objecting to each other's claims.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (2007), incorporated by Fed. R. Bankr. P. 7056. "All facts

4

and reasonable inferences must be construed in the light most favorable to . . . the non-moving

party." <u>Mannoia v. Farrow</u>, 476 F.3d 453, 457 (7th Cir. 2007).

There are two ways to meet the burden borne by the party moving for summary

judgment. The classic way is to show that the undisputed facts entitle the movant to judgment as

a matter of law. See <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 159-60 (1970). The more

"modern"[1] method is "by 'showing' -- that is, pointing out to the district court -- that there is an

absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S.

317, 325 (1986). Where the movant is relying on this second method of obtaining summary

judgment, under the "substantial evidence standard," the movant must show that the nonmovant

has insufficient evidence to survive summary judgment. Then the burden shifts to the

nonmovant to present such evidence.

Subpart (e) of Rule 56 sets forth the substantial evidence standard.

> Supporting and opposing affidavits shall be made on personal
> knowledge, shall set forth such facts as would be admissible in evidence,
> and shall show affirmatively that the affiant is competent to testify to the
> matters stated therein. Sworn or certified copies of all papers or parts
> thereof referred to in an affidavit shall be attached thereto or served
> therewith. The court may permit affidavits to be supplemented or
> opposed by depositions, answers to interrogatories, or further affidavits.
> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon the mere
> allegations or denials of the adverse party's pleading, but the adverse
> party's response, by affidavits or as otherwise provided in this rule, must
> set forth specific facts showing that there is a genuine issue for trial. If
> the adverse party does not so respond, summary judgment, if
> appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e). The rule's requirement that affidavits be made based on personal

knowledge "parallels Rule 602 of the Federal Rules of Evidence, which forbids a witness (other

---

[1] <u>See also</u> 2 Moore's Manual: Federal Practice & Procedure § 17.23[3][b] ("the modern view is that summary judgment may be appropriate even if material facts are contested when the nonmovant fails to provide substantial evidence of such contested facts") (citing <u>Celotex</u>).

than an expert witness . . .) to testify to matters of which he does not have personal knowledge."

Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1572 (7th Cir. 1989). "Personal knowledge

within the meaning of these rules includes . . . inferences from sense data as well as the sense

data themselves (all knowledge is inferential—including sense data)." Id.

     If "recharacterization" of a claim as an equity interest is not a cause of action under the

Bankruptcy Code, the undisputed facts entitle TDS to judgment as a matter of law.   There are

three procedures that could result in a claim being relegated to the status of an interest in

bankruptcy.   The FCC only articulated one of them but the FCC's factual allegations probably

raise all three.   The first such procedure is disallowance of the claim under § 502(b) of the

Bankruptcy Code.   The second is reconsideration of a previously allowed claim under § 502(j).

The third is the independent doctrine known as recharacterization.   Most courts that recognize

the recharacterization doctrine do so pursuant to their general equitable powers provided by

§ 105(a).   A majority of courts, both lower courts within the Seventh Circuit and U.S. Courts of

Appeals for other circuits, have when asked adopted the theory of recharacterization under

§ 105(a).   A few judges have determined that recharacterization is an errant strand of tax law that

was wrongly imported into bankruptcy law.[2]

     Section 502 of the Code governs allowance and disallowance of claims and interests.   It

provides that a claim of which proof is filed "is deemed allowed, unless a party in interest . . .

objects."   § 502(a).   Upon objection, the presumption of allowability ceases to exist and the

burden of going forward is the claimant's responsibility.   "[I]f such objection to a claim is made,

the court . . . shall determine the amount of such claim . . . and shall allow such claim in such

amount," unless one of nine exclusive exceptions applies.   § 502(b).   Those exceptions are when

---

[2] See, e.g., Transcr. of Jan. 14, 2002 Hearing at 32-35, In re Outboard Marine Corp., Case No. 00-B-37405 (Bankr. N.D. Ill. 2002), rev'd by 50 Collier Bankr. Cas. 2d (MB) 931 (N.D. Ill. 2003).

the claim at issue is "unenforceable against the debtor . . . under any agreement or applicable law," § 502(b)(1); "is for unmatured interest," § 502(b)(2); "is for [property tax that] exceeds the value of the interest of the estate in [the] property," § 502(b)(3); "is for services of an insider or attorney of the debtor" and "exceeds the reasonable value of such services," § 502(b)(4); is for unmatured debt on specified alimony and child support obligations, § 502(b)(5); is for certain "damages resulting from the termination" of a lease or employment contract, §§ 502(b)(6) and (7); "results from a reduction, due to late payment, in the amount of . . . credit available to the debtor in connection with an employment tax on wages . . . earned from the debtor," § 502(b)(8); or was filed late, § 502(b)(9).

There are only two provisions of § 502(b) that could even arguably permit a court to alter the parties' classification of their financing agreements. First, the allowable amount of a purported claim that does not fall within the Code's definition of "claim" is zero. § 502(b) (permitting court to determine amount of claim and allow claim in such amount). The Code's definition of claim is extremely broad, including any right to payment or "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." § 101(5). Second, § 502(b)(1) disallows a claim that is unenforceable against the debtor or property of the debtor under an agreement or applicable law. "[C]laims enforceable under state law will be allowed in bankruptcy unless they are expressly disallowed." Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec., 127 S. Ct. 1199, 1206, 167 L. Ed. 2d 178, 187 (2007). But a filed claim that is facially an equity interest is not truly enforceable under state law.

Section 502(a) and Bankruptcy Rule 3001 presume that TDS's Proof of Claim 14 and corresponding documentation mean what they say. Far from giving TDS an equity interest in Airadigm, the faces of these documents attest to a true loan transaction. The fact that Airadigm

7

could only repay the loans by surrendering the collateral does not mean they were not loans. The

FCC has not proved otherwise and has not demonstrated that Claim 14 would be unenforceable

at state law—especially given that TDS was not a shareholder of Airadigm at the time of

lending. See Gelatt v. DeDakis (In re Assignment for Benefit of Creditors of Mader's Store for

Men, Inc.), 77 Wis. 2d 578, 602 (1977) (Abrahamson, J.) ("the law approaches transactions

between a corporation and those in a position to control its acts with a large measure of watchful

care").

   In applying § 502(b) to a creditor's recharacterization request, I respectfully disagree

with a 2006 decision of the U.S. Court of Appeals for the Fourth Circuit which held that

recharacterization does not take place under § 502(b) at all.

> Disallowance of a claim under § 502(b) is only appropriate when the
> claimant has *no* rights vis-à-vis the bankrupt, *i.e.*, when there is no basis
> in fact or law for *any* recovery from the debtor. When a bankruptcy
> court disallows a claim, the claim is completely discharged. By contrast,
> recharacterization is appropriate when the claimant has *some* rights vis-
> à-vis the bankrupt. That is, when a bankruptcy court recharacterizes a
> claim, it necessarily recognizes the existence of a relationship between
> the debtor and the claimant, but it determines that the relationship is one
> of an equity owner rather than a creditor.

Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N.

Am.), Inc.), 453 F.3d 225, 232 (4th Cir. 2006) (marks and citations omitted). Irrespective of how

far beyond the parties' agreements a court can look to determine whether a purported claim is

legitimate, the Dornier Aviation view seems wrong. Just because a filed claim is unenforceable

against the debtor does not mean that the claimant has no rights against the debtor; not all monies

given to a debtor give rise to a claim. Section 501 of the Bankruptcy Code provides for the filing

of proofs of claims and proofs of interests. Debtors have relationships with both claimants and

interest holders. If an interest holder (such as a garden-variety stockholder) mistakenly files a

proof of claim instead of a proof of interest, the proper remedy is to disallow the claim. The

8

interest holder could then file a proof of interest, assuming that the time for doing so had not elapsed or that the court permitted the late filing. Disallowing a claim under § 502(b) is appropriate not just when the claimant has no rights vis-à-vis the debtor, but when the claimant's rights vis-à-vis the debtor do not satisfy the definition of claim in § 101(5). An interest holder might still have ample rights against a debtor, such as a stockholder's right to equitable remedies that do not give rise to rights to payment, including injunctions against improper distribution, oppression by a majority shareholder, or securities fraud. See § 101(5)(B). I cannot agree that "even if a claimant is able to meet § 502's minimal threshold for allowance of the claim, the bankruptcy court still must look beyond the form of the transaction to determine the claim's proper priority." Dornier Aviation, 453 F.3d at 232.

Section 502(j) of the Bankruptcy Code provides additional grounds for disallowing claims. It provides in part: "A claim that has been allowed or disallowed may be reconsidered for cause. *A reconsidered claim may be allowed or disallowed according to the equities of the case.*" § 502(j) (emphasis added). Section 502(j) is almost identical to § 57(k) of the Bankruptcy Act of 1898, on which the Supreme Court relied when it recharacterized a creditor's claim nearly 70 years ago in Pepper v. Litton. Section 57(k) provided: "Claims which have been allowed may be reconsidered for cause and reallowed or rejected in whole or in part, according to the equities of the case. . . ."

The Bankruptcy Code does not define "cause" for reconsideration. Bankruptcy Rule 9024 unmistakably provides that Rule 60(b) of the Federal Rules of Civil Procedure applies to motions for reconsideration of claim allowance: "Rule 60 F.R.Civ.P. applies in cases under the Code except that (1) a motion to reopen a case under the Code or for the reconsideration of an order allowing or disallowing a claim against the estate entered without a contest is not subject to

9

the one year limitation prescribed in Rule 60(b)." Cause for reconsideration therefore can only

consist of one of the six narrow categories of cause under Rule 60(b): (1) mistake or excusable

neglect; (2) newly discovered evidence; (3) fraud, misrepresentation or other misconduct; (4) the

judgment is void; (5) the judgment has been satisfied, released or discharged, or a prior judgment

upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that

the judgment should have prospective application; or (6) any other reason justifying relief from

the operation of the judgment. Nationsbanc Mortgage/Federal Nat'l Mortgage Ass'n v. Williams

(In re Williams), 276 B.R. 899, 906 (C.D. Ill. 1999); see Ackermann v. United States, 340 U.S.

193, 202 (1950) (narrowly construing the categories, e.g., enumeration of excusable neglect in

paragraph 60(b)(1) precludes catch-all paragraph (6) from including inexcusable neglect);

Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc., 131 F.3d 625, 628 (7th Cir. 1997) ("Rule

60(b) relief is an extraordinary remedy and is granted only in exceptional circumstances"). So

even though the Code says that a reconsidered claim may be disallowed "according to the

equities of the case," before the equities can be considered, the reason for reconsideration must

fit into one of six narrow types. The FCC has not alleged cause for reconsideration within the

meaning of Rule 60(b).

While the FCC does not expressly rely on § 105(a) for its recharacterization theory, the

cases cited by the FCC do. E.g., Dornier Aviation, 453 F.3d at 231; Cohen v. KB Mezzanine

Fund II, LP (In re Submicron Sys. Corp.), 432 F.3d 448, 454 n.6 (3d Cir. 2006); Bayer Corp. v.

Mascotech Inc. (In re AutoStyle Plastics, Inc.), 269 F.3d 726, 748 (6th Cir. 2001). These courts

reason that bankruptcy courts have "equitable powers to test the validity of debts." AutoStyle

Plastics, 269 F.3d at 748.

But bankruptcy courts, while originally fashioned as courts of equity under the Bankruptcy Act of 1898, do not possess limitless power to "do equity." In re Grabill Corp., 967 F.2d 1152, 1155 (7th Cir. 1992) ("It is well established that Congress vests Bankruptcy Courts with their jurisdiction and their authority has no 'inherent' source"). Under the old Bankruptcy Act, bankruptcy courts were "invested . . . with such jurisdiction at law and in equity" to "adjudge persons [who were] bankrupt," 11 U.S.C. § 2(a)(1) (repealed 1978), to "[m]ake such orders, issue such process, and enter such judgments, in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this Act," § 2(a)(15) (repealed 1978), and to perform many other bankruptcy-related exercises, § 2(a)(2)-(14), (16)-(1), § 2(b) (all repealed 1978). The vast majority of Bankruptcy Act adjudication was equitable in nature. Local Loan Co. v. Hunt, 292 U.S. 234, 240 (1934) ("The words 'at law' were probably inserted to meet clause (4) of § 2, which empowers such courts to arraign, try and punish certain designated persons for violations of the act").

Section 105(a), in contrast, "is affirmatively *not* a statutory authorization of equity." Adam J. Levitin, Toward a Federal Common Law of Bankruptcy: Judicial Lawmaking in a Statutory Regime, 80 Am. Bankr. L.J. 1, 24 (2006). Congress did try to authorize equitable jurisdiction in the 1978 Code. 28 U.S.C. § 1481 (repealed 1984) ("A bankruptcy court shall have the powers of a court of equity, law, and admiralty"). Congress repealed that authorization, however, in the wake of Northern Pipeline Construction Co. v. Marathon Pipe Line Co. Bankruptcy Amendments and Federal Judgeship Act (BAFJA) of 1984, 98 P.L. 353; 98 Stat. 333, § 113 (1984); see Levitin, *supra*, at 27-30 (detailing the brief, tortured history of § 1481). Currently, the only reed on which bankruptcy courts' equitable jurisdiction rests is § 105(a): "The court may issue any order, process, or judgment that is necessary or appropriate to carry out

11

the provisions of this title." This subsection, unlike § 2 of the Act and former § 1481, contains

no mention of jurisdiction in equity or the powers of a court of equity. In fact, it does not even

appear to be a jurisdictional provision, as § 105(c) states that a bankruptcy judge's jurisdiction

"shall be determined by reference to the provisions . . . set forth in title 28."[3]

It is therefore logical that a bankruptcy court's power under § 105(a) "must and can only

be exercised within the confines of the Bankruptcy Code." Norwest Bank Worthington v.

Ahlers, 485 U.S. 197, 206 (1988). Where the Code or Bankruptcy Rules have established a

framework for accomplishing a particular objective, a bankruptcy court cannot circumvent that

framework by invoking § 105(a). Disch v. Rasmussen (In re Rasmussen), 417 F.3d 769, 777-78

(7th Cir. 2005); see also Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 24-25 (2000)

("Bankruptcy courts are not authorized in the name of equity to make wholesale substitution of

underlying law controlling the validity of creditors' entitlements, but are limited to what the

Bankruptcy Code itself provides") (9-0 decision); U.S. v. Noland, 517 U.S. 535, 540-41 (1996)

(bankruptcy courts have no authority to change the order of priority established by Congress) (9-

0 decision).

This longstanding principle remains valid despite a statement on the breadth of § 105(a)

in Marrama v. Citizens Bank of Mass., 127 S. Ct. 1105, 166 L. Ed. 2d 956 (2006). The issue in

Marrama was whether language in the Bankruptcy Code stating that a debtor has an unwaivable

right "at any time" to convert a chapter 7 case to a chapter 13 case prohibited a court from

denying conversion where the chapter 13 case would promptly be dismissed due to the debtor's

---

[3] I recognize that courts have continually repeated the mantra "bankruptcy courts are courts of equity" since the 19th century. The Supreme Court has done so as recently as 2002. Young v. United States, 535 U.S. 43, 50 (2002) (Scalia, J.). But cases like Ahlers, combined with the repeal of 28 U.S.C. § 1481, leave significant doubt as to whether the mantra still accurately reflects bankruptcy courts' powers. See Alan M. Ahart, *The Limited Scope of Implied Powers of a Bankruptcy Judge: A Statutory Court of Bankruptcy, Not a Court of Equity*, 79 Am. Bankr. L.J. 1, 37 (2005). It is possible that the phrase "court of equity" now refers more to bankruptcy courts' summary procedures than to any broad equitable discretion they may exercise. Levitin, *supra* at 5-6. Even so, the weight given that phrase in dicta no longer comports with how the Supreme Court understood the same phrase in Pepper.

pre-bankruptcy misconduct.    The Supreme Court stated that bankruptcy courts possessed power

to deny the motion to convert immediately under § 105(a) "to prevent an abuse of process," even

though the Bankruptcy Code could be read as suggesting otherwise.    But Marrama also held that

the Code's description of the right to convert as unwaivable and exercisable "at any time" was

not an absolute right, at least in the hands of a debtor who "does not qualify as a debtor under

Chapter 13." Id. at 1111, 966. And "[a] statutory provision protecting a borrower from waiver is

not a shield against forfeiture." Id. Thus, the Court left intact the prohibition on using § 105(a)

to circumvent the Code's framework for accomplishing a particular objective.    Marrama is

additionally distinguishable because it involved abusive litigation practices by the debtor, which

§ 105(a) addresses in a different sentence than the sentence courts use to rationalize

recharacterization.[4] Id.

     Recharacterization under § 105(a) is never appropriate because the Code and Rules have

established a framework for subordinating claims to one another, and using § 105(a) to achieve

the same result circumvents that framework.    Section 510(c) of the Bankruptcy Code provides, in

part:

> after notice and a hearing, the court may—(1) under principles of
> equitable subordination, subordinate for purposes of distribution all or
> part of an allowed claim to all or part of another allowed claim or all or
> part of an allowed interest to all or part of another allowed interest. . . .

Congress went out of its way to explain that a claim could be subordinated to a claim and an

interest likewise to an interest.    In doing so, Congress provided that a claim could only be

equitably subordinated within the broad tier of claims, not into the lower tier of interests.    If a

---

[4] Section 105(a) reads in full: "The court may issue any order, process, or judgment that is necessary or appropriate
to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in
interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination
necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

bankruptcy court could subordinate a claim into the tier of interests using § 105(a), the contrary

language in § 510(c)(1) might as well not exist.  See Rasmussen, 417 F.3d at 778.

Perhaps even more importantly, using § 105(a) to recharacterize a claim circumvents the

established doctrines – both substantive and procedural – that have long guided application of

equitable subordination.  The Bankruptcy Rules require equitable subordination to be brought as

an adversary proceeding.  Fed. R. Bankr. P. 7001(8).  Adversary proceedings proceed mostly

according to the rules of civil procedure, while in contested matters – as the FCC has styled its

recharacterization request by bringing it as an objection to claim – several of those rules are

waived in order to reduce litigation costs.  Fed. R. Bankr. P. 9014(c).  Using § 105(a) to

recharacterize claims circumvents the procedural safeguards of adversary proceedings in

violation of Ahlers and Rasmussen.  The Ninth Circuit's Bankruptcy Appellate Panel addressed

this identical issue:

> The result achieved by such a determination, i.e. subordination, is
> governed by 11 U.S.C. section 510(c).  Where there is a specific
> provision governing these determinations, it is inconsistent with the
> interpretation of the Bankruptcy Code to allow such determinations to be
> made under different standards through the use of the court's equitable
> powers.

Unsecured Creditors' Committees v. Pioneer Commercial Funding Corp. (In re Pacific Express,

Inc.), 69 B.R. 112, 115 (B.A.P. 9th Cir. 1986).

It is understandable, then, that litigants arguing for recharacterization attempt to

distinguish the doctrine from equitable subordination.

> In a recharacterization analysis, if the court determines that the advance
> of money is equity and not debt, the claim is recharacterized and the
> effect is subordination of the claim as a proprietary interest because the
> corporation repays capital contributions only after satisfying all other
> obligations of the corporation. In an equitable subordination analysis, the
> court is reviewing whether a legitimate creditor engaged in inequitable
> conduct, in which case the remedy is subordination of the creditor's
> claim to that of another creditor only to the extent necessary to offset

injury or damage suffered by the creditor in whose favor the equitable
doctrine may be effective.

AutoStyle Plastics, 269 F.3d at 748-49; see also Submicron Sys., 432 F.3d at 454; Blasbalg v.

Tarro (In re Hyperion Enters., Inc.), 158 B.R. 555, 560 (D.R.I. 1993); Aquino v. Black (In re

AtlanticRancher, Inc.), 279 B.R. 411, 433 (Bankr. D. Mass. 2002).

But even assuming these courts are correct that recharacterization is a separate cause of

action from equitable subordination,[5] recharacterization has exactly the same result as equitable

subordination. Autostyle Plastics recognized this: "the effect is subordination of the claim." 269

F.3d at 748. The fact that equitably subordinating a claim to an interest would not stop the claim

from being called a claim – nor a creditor from nominally retaining its right as creditor to vote on

a chapter 11 plan, 4 Collier on Bankruptcy ¶ 510.02[1] (Alan N. Resnick & Henry J. Sommers,

eds., 15th ed. rev. 2006) – is insignificant given that the most pertinent consequences of such a

subordination would be the same as recharacterization.

The inappropriateness of § 105(a) for extra-statutory subordination is even more

pronounced in this circuit than elsewhere. In the Seventh Circuit, it takes more than a finding of

undercapitalization to warrant equitable subordination; the plaintiff must prove inequitable

conduct by the defendant. In re Lifschultz Fast Freight, 132 F.3d 339, 349 (7th Cir. 1997). The

reason for that requirement further weighs against a role for a separate recharacterization cause

of action in bankruptcy:

---

[5] To the contrary, it is likely that – at least in bankruptcy cases rather than tax cases – equitable subordination and
recharacterization historically were the same. E.g., Pepper v. Litton, 308 U.S. 295, 308-10 (1939) (using the two
concepts interchangeably); AtlanticRancher, 279 B.R. at 433 ("*while once considered solely in conjunction with the
doctrine of equitable subordination*, bankruptcy courts now consider recharacterization a separate cause of action"
[emphasis added]); Gelatt, 77 Wis. 2d at 604 n.17 ("Several commentators have pointed out that as a matter of logic,
a finding that an advance is in fact a capital contribution should result in disallowance of the claim rather than
subordination, since no claim in insolvency may be based on a proprietary interest. The courts, however, generally
only subordinate the claim in such cases"); Asa S. Herzog and Joel B. Zweibel, The Equitable Subordination of
Claims in Bankruptcy, 15 Vand. L. Rev. 83, 93-95 (1961) (considering recharacterization as a species of equitable
subordination).

> This task [i.e., equitable subordination] by nature requires the court to
> make extremely subjective judgments as to whether a party has acted
> opportunistically. And easy, clear rules to find underhanded behavior
> are hard to come by, because the clever soon figure out ways around
> them. What courts can try to do, however, is to mark off territory where
> there is generally no justification for equitable subordination. We
> attempt to do so here: undercapitalization alone, without evidence of
> deception about the debtor's financial condition or other misconduct,
> cannot justify equitable subordination of an insider's debt claim.

Id. (marks and citations omitted). "To hold otherwise would discourage those most interested in

a corporation from attempting to salvage it through an infusion of capital." Id. at 347 (marks

omitted). That is, subjective multi-factor tests to determine in hindsight whether a debt is really

a debt undermine reasonable commercial expectations and ultimately deter investment.

Replacing this careful analysis with a new, unwieldy doctrine that does not originate in the text

of the Bankruptcy Code would controvert Lifschultz Fast Freight. It would be beyond the scope

of § 105(a).

Even if there is room for a recharacterization cause of action in the Bankruptcy Code, it

can only be sought against an insider of the debtor. Despite many courts' assertion in dicta that

none of the innumerable factors used to decide recharacterization questions is dispositive, e.g.,

Dornier Aviation, 453 F.3d at 233, no court has recharacterized a non-insider's claim. "[T]he

law approaches transactions between a corporation and those in a position to control its acts with

a large measure of watchful care." Gelatt, 77 Wis. 2d at 602. That makes sense, because their

position of control gives insiders the opportunity to disguise an equity contribution as a debt.

Insiders who are controlling shareholders also have an incentive to disguise a fresh infusion of

capital as a loan, in that they would have the rights both to reap the debtor's profits if

reorganization succeeded, and to share pro rata in its assets if the debtor liquidated. TDS, having

not claimed to be a shareholder in Airadigm, would have no rights to share in Airadigm's profits

if the 1999 reorganization succeeded—even if it would receive Airadigm's non-license assets in

16

satisfaction of its loans.  The FCC's argument that TDS was a "constructive equity holder," whatever that is, is irrelevant because TDS never claimed the benefits of being a shareholder. TDS was not trying to have it both ways.

The FCC argues that some courts have, in fact, recharacterized non-shareholders' claims as equity.  But the FCC too finely parses the language in the lone case it cites for this proposition, omitting the court's key finding that the claimant was an insider.  <u>AtlanticRancher</u>, 279 B.R. at 415-18.  The court specifically stated:

> In view of the rights to pervasively control the Debtor that Black [the non-shareholder creditor] obtained under the Note and Warranty Subscription Agreement . . . *the Court finds that Black became an insider of the Debtor* as that term is defined in 11 U.S.C. § 101(31)(B)(iii).... In short, although Black was not technically an owner of the company, [the president of the Debtor] . . . was compelled to treat him as if he were a substantial owner of the company rather than simply a lender.

<u>Id.</u> at 435-36 (emphasis added).  The FCC, while it has alleged a string of shady and otherwise bad behavior on TDS's part, has never explained how TDS could be an insider of a debtor of which it is not a director, officer, or controlling shareholder.  <u>Cf.</u> § 101(31)(B).  Therefore, even if recharacterization exists, it cannot be applied to TDS's claims.

In conclusion, while § 502(b) is the most suitable vehicle for converting a claim to an equity interest, the FCC has not met its burden of disproving TDS's claim under either of the pertinent paragraphs of § 502(b).  There is no cause for reconsideration under § 502(j).  There is – or should be – no such cause of action as recharacterization in bankruptcy.  The standard for equitable subordination is well-established and ignoring it in favor of the recharacterization doctrine would constitute misuse of § 105(a).

TDS has also moved for summary judgment on the value of the collateral securing Claim 14.  Typically, valuation is the quintessential question of fact, as to which summary judgment is

inapplicable. However, in order to facilitate summary judgment, TDS argues that the collateral is worth $23.1 million, an amount that TDS states is significantly lower than what TDS actually believes the collateral is worth. Under the presumption of validity that Code § 502(a) confers on a filed claim, TDS can prevail on valuation at summary judgment if it shows that the FCC has insufficient evidence to rebut the presumption of validity, and the FCC fails to present such evidence.

TDS identifies two evidentiary justifications supporting a collateral value exceeding $23.1 million. First, the debtor's own opinion is that the collateral is worth $38,162,291.08. Sched. B. Second, a report that TDS and Airadigm commissioned in 2004 from the investment bank Duff & Phelps, LLC estimated a mid-range total enterprise value of Airadigm of $50 million, plus cash reserves of $11,114,605. After subtracting the value of Airadigm's licenses, the value of all Airadigm's unlicensed assets according to this method would be $28,105,444.

The FCC responds that TDS has not met its burden of proving the value of a contingent or unliquidated claim (which, I note, Claim 14 is not) and that the Court should grant time for the FCC to conduct further discovery before granting TDS's motion for summary judgment. The FCC presents no evidence of valuation except its attorney's affidavit, which states:

> 6.    The Motion makes clear that the value of the Debtor's so-called unlicensed assets is a genuine issue of material fact. . . .

> 11.    The Motion also relies on the book value of certain of the Debtor's assets.

Aff. of Seth B. Shapiro. The affidavit further states that TDS has not designated anyone as an expert on valuation, not even Duff & Phelps. In addition, the affidavit complains that the FCC "has not had sufficient time to depose the Debtor's accounting staff to determine how the Debtor's assessment of the book value of its assets was prepared, including information about what depreciation rates were utilized." Id. at ¶ 12.

The first question is which party bears the burden of proof on valuation. Section 502(a) of the Bankruptcy Code states that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). The Code thus appears to create a presumption of validity of the amount of a filed claim, unless someone objects, in which case the claimant would bear the burden of proof de novo. Bankruptcy Rule 3001(f) states the matter differently: "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." But title 28 provides that "Bankruptcy Rules shall not abridge any substantive right." 28 U.S.C. § 2075. To the extent that § 502(a) and Rule 3001(f) conflict, § 502(a) must prevail.

Logically, an objection to a claim must provide some evidence to defeat the presumption of validity. If an objector could merely say "I object" and defeat the presumption of validity, the first clause of § 502(a) – "a claim . . . is deemed allowed" – would be nearly meaningless.

While TDS has provided ample evidence of valuation, it likely has not met its initial burden under the modern theory of summary judgment because its expert evidence would be inadmissible at trial. See Celotex Corp., 477 U.S. at 325. By affidavit, TDS has submitted a report from an investment bank, Duff & Phelps, indicating that in 2003 Airadigm's net fixed assets were worth $32.3 million (net fixed assets did not include the licenses, cash, accounts receivable, et al.). The report projected that the value of those assets in 2006 would be $22.5 million, slightly less when accounting for both depreciation and future capital expenditures. Airadigm's own valuation of those assets as of the petition date arrived at a similar amount. When Airadigm's $11 million in cash (an amount the FCC does not dispute) is added, Airadigm's non-license assets would far exceed $23.1 million.

However, TDS has not designated Duff & Phelps as an expert, Aff. of Seth B. Shapiro at

¶ 9, so Duff & Phelps's report would not yet be admissible at trial. If TDS were to designate

Duff & Phelps as an expert, the FCC would be entitled to the automatic disclosures of its report

pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, incorporated into valuation

hearings by Bankruptcy Rules 3007 and 7001.

> Except as otherwise stipulated or directed by the court, this disclosure
> shall, with respect to a witness who is retained or specially employed to
> provide expert testimony in the case or whose duties as an employee of
> the party regularly involve giving expert testimony, be accompanied by a
> written report prepared and signed by the witness. The report shall
> contain a complete statement of all opinions to be expressed and the
> basis and reasons therefor; the data or other information considered by
> the witness in forming the opinions; any exhibits to be used as a
> summary of or support for the opinions; the qualifications of the witness,
> including a list of all publications authored by the witness within the
> preceding ten years; the compensation to be paid for the study and
> testimony; and a listing of any other cases in which the witness has
> testified as an expert at trial or by deposition within the preceding four
> years.

Fed. R. Civ. P. 26(a)(2)(B). "In the absence of other directions from the court or stipulation by

the parties, the disclosures shall be made at least 90 days before the trial date or the date the case

is to be ready for trial." Fed. R. Civ. P. 26(a)(2)(C).

A court should not grant summary judgment until the automatic disclosures of Rule 26(a)

have been provided to the nonmovant. See Corley v. Rosewood Care Ctr., Inc., 142 F.3d 1041,

1055 (7th Cir. 1998) (reversing grant of summary judgment where non-movant had been

afforded inadequate discovery). Because parties must make these disclosures automatically,

without request, this is not what the U.S. Court of Appeals for the Seventh Circuit had in mind

when it wrote: "A party who has been dilatory in discovery may not use Rule 56(f) to gain a

continuance where he has made only vague assertions that further discovery would develop

genuine issues of material fact." U.S. v. Bob Stofer Oldsmobile-Cadillac, Inc., 766 F.2d 1147,

1153 (7th Cir. 1985). After all, if failure to disclose an expert's testimony is a basis for striking that testimony at trial, it is equally inappropriate to use the expert's testimony to grant summary judgment before the testimony has been formally disclosed. <u>See</u> <u>Cummins v. Lyle Indus.</u>, 93 F.3d 362, 371 (7th Cir. 1996).

TDS's motion for partial summary judgment is granted in part. TDS's proof of claim is presumed valid and the FCC has not rebutted the presumption of validity, except as to the value of the collateral securing Claim 14. The interest rate on Claim 14 is prescribed by the 2000 plan at 8.5 percent. Accordingly, the FCC's objection to Claim 14 is overruled except insofar as the FCC objects to the value TDS ascribes to the collateral.

Dated:  May 11, 2007

ROBERT D. MARTIN
UNITED STATES BANKRUPCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

AIRADIGM COMMUNICATIONS, INC.,                    (Chapter 11)

        Debtor.                                    Case No. 06-10930

ORDER

On the findings of fact and conclusions of law contained in the memorandum decision filed this date, it is hereby ORDERED:

    1. Telephone and Data Systems, Inc.'s ("TDS") Motion for Partial Summary Judgment on the Federal Communications Commission's ("FCC") Objections to Claim No. 14 of TDS is GRANTED except as to the value of the collateral for Claim No. 14.

Dated: May 11, 2007

ROBERT D. MARTIN
UNITED STATES BANKRUPCY JUDGE