IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

AIRADIGM COMMUNICATIONS, INC.,                    (Chapter 11)

                    Debtor.                    Case No. 06-10930

MEMORANDUM DECISION

The Federal Communications Commission (FCC) has objected to the validity or amount

of Claims 14, 15, and 16 filed by Telephone & Data Systems, Inc. (TDS) in this Chapter 11 case.

Several of the objections have been resolved. The validity of Claim 14 has been upheld, and the

parties have stipulated to the amount. Claim 16 has been allowed in full. Thus, only Claim 15

was considered at the September 25th hearing and remains for decision. Claim 15 is based on a

claim assigned to TDS by Oneida Enterprise Development Authority (OEDA).

This is Airadigm's second chapter 11 filing. The first was in 1999. A plan of

reorganization was confirmed in that case on November 15, 2000 (The "2000 Plan," Joint Ex. 6).

The partially-secured claim of OEDA for $40 million was to be satisfied under the terms of the

2000 Plan.

OEDA was a proponent of the 2000 Plan. TDS was a designated "Buyer" but was not a

proponent of the Plan. The 2000 Plan contained a primary treatment of claims (2000 Plan

Article V, the "primary treatment") and a back-up treatment (2000 Plan Article X, the "back-up

treatment"). The primary treatment provided for full payment of the OEDA claim, while the

back-up treatment provided only a partial payment. The parties now dispute whether events

have triggered the back-up treatment under the 2000 Plan, and if so, the effect of that treatment

on the OEDA claim.

In 2004, before any payment had been made to OEDA under the 2000 Plan, TDS sued OEDA in the Eastern District of Wisconsin.  The parties settled that lawsuit on terms memorialized in the 2004 Settlement Agreement and Mutual Release, executed in July, 2004 ("2004 Settlement Agreement").  That Agreement fully released parties (including Airadigm) from all claims and obligations owed to OEDA.  It also assigned all of OEDA's claims against Airadigm to TDS.  The parties dispute whether OEDA's claim was first released and then "assigned," or was first assigned to TDS with only residual claims against Airadigm (if any) "released."  TDS argues that it was assigned a right to payment of more than $49 million.  That right to payment is the basis for Claim 15.[1]

Finally, the FCC objects to the amount of Claim 15.  TDS filed the claim for $40,000,000 plus $13,258,025.21 in accrued interest.  If Claim 15 is derived from the primary treatment of the 2000 Plan, the principal would seem to be $49 million.  However, TDS filed the claim for the principal sum of $40 million and has not formally amended that claim.  The right to any interest on the claim is disputed.

More history is needed to understand the current dispute.  In 1997, Airadigm purchased 15 licenses to use certain bands of airwaves at an FCC auction.  When Airadigm filed its Chapter 11 bankruptcy in 1999, the FCC "revoked" the licenses.  Airadigm, as debtor in possession, continued to use the licenses and petitioned the FCC to have the licenses reinstated.  The 2000 Plan was proposed and confirmed on the assumption that the licenses had been revoked.  It provided one treatment for creditors if the petition for reinstatement were granted (the primary treatment) and another treatment if the petition were denied or not timely reinstated (the back-up

---

[1] For simplicity, the right to payment of this obligation is referred to hereinafter as "Claim 15."

2

treatment).

The assumption behind the 2000 Plan was incorrect. The licenses were not revoked. The FCC lacked authority to revoke the licenses. In 2003 the United States Supreme Court ruled on nearly identical facts that an FCC revocation of licenses was not effective. FCC v. Nextwave Communications, Inc., 537 U.S. 293 (2003). The FCC had taken no action to reinstate the Airadigm licenses prior to the announcement of the Nextwave decision. Because Airadigm's licenses were never revoked, it is now technically impossible for the FCC to "reinstate" the licenses. Even though the licenses have not been reinstated, Airadigm possesses and utilizes them as if they were. The drafters of the 2000 Plan did not anticipate such an outcome.

The 2000 Plan can be read as either subjecting Claim 15 to the primary treatment or the back-up treatment. The primary treatment would control if the apparent intention of the drafters and accepting creditors were simply carried out. The back-up treatment follows from a more technical reading of the plan.

The 2000 Plan calls for TDS to pay $2 million to OEDA. "On the Back-up Transfer Date . . . [TDS] shall pay OEDA $2 million in full satisfaction of its secured Claims." 2000 Plan ¶ 10.7. "After the Back-up Transfer Date, no additional payments will be made on account of Claims against the Debtor . . . ." ¶ 10.2. The Back-up Transfer date occurred on November 14, 2002.[2] There has been technical compliance with these sections of the 2000 Plan and TDS has paid OEDA $2 million pursuant to the 2004 Settlement Agreement. But TDS now asks that the payment to OEDA be ignored, so that a less technical view of the 2000 Plan's intention can be followed.

---

[2] Am. Ord. Denying Motion of Oneida Enterprise Development Authority for an Ord. Interpreting Confirmed Plan and Enforcing Its Terms, In re Airadigm Communications, Inc., Case No. 99-33500 (Docket No. 507, Bankr. W.D. Wis., November 17, 2003).

A confirmed plan of reorganization is interpreted under contract law. Siemens Energy & Automation, Inc. v. Good (In Re: Heartland Steel, Inc.), 389 F.3d 741 (7th Cir. 2004) ("[W]hen faced with ambiguous language in a document drafted by private parties," i.e., a confirmed plan of reorganization, "one should apply the ordinary rules of contract construction."). "The primary objective in interpreting a contract is to ascertain and carry out the intentions of the parties." General Cas. Co. v. Hills, 209 Wis. 2d 167 (Wis. 1997). "The rules for the construction of contracts are all subordinate to the cardinal principle that the intention of the parties, to be gathered from the whole instrument, must prevail unless it is inconsistent with some established principle of law." Williston on Contracts § 30.2 (4th Ed. 1997).

When the 2000 Plan was proposed and confirmed Airadigm continued to operate much as it had before license revocation—apparently by the grace of the FCC. It is fairly clear that the parties to the 2000 Plan intended the primary treatment to control if Airadigm regained control of its licenses. As owner of the licenses, the parties anticipated that Airadigm would continue to be operated (albeit by the "Buyer") and that many creditors would be "paid in full." 2000 Plan ¶¶ 5.1, 5.2, 5.4, 5.5, 5.7. Several creditors would be paid "On the Reinstatement Payment Date . . . ." ¶¶ 5.1, 5.2, 5.3. If Airadigm lost the use of its licenses, or failed to regain control of them prior to June 30, 2002 the primary treatment would give way to the back-up treatment.

The back-up treatment contemplated a liquidation. It would be triggered if Airadigm lost the licenses (if "the FCC either denies reinstatement of all Licenses, or fails to act on the Petition for Reinstatement in a timely manner"). ¶ 10.1. Airadigm would transfer all of its "unlicensed assets" to TDS. ¶ 10.2. The licenses would be auctioned by the FCC and the auction proceeds, if any, would be divvied among various creditors. ¶ 10.5. The equity interests would be cancelled. ¶ 10.6. All claims not specifically mentioned would be no longer entitled to payment.

4

¶ 10.2.

Nextwave upset the scheme. The revocation of the licenses was nullified. Airadigm

owns the licenses and is not being liquidated. Thus, putting aside questions of timing, it would

appear that the parties to the 2000 Plan intended Claim 15 to be subject to the primary treatment.

But timing cannot be put aside. It is crucial in determining whether the events triggering

the back-up treatment occurred. ¶ 10.1 is captioned "The Alternate Plan — Generally." That

paragraph states that "This Article X describes the alternate or 'back-up' plan, which will govern

if . . . the FCC either denies reinstatement of all Licenses, or fails to act on the Petition in a

timely manner." The FCC has failed to act on the Petition for Reinstatement (it has yet to issue a

final order on the Petition), thus the FCC has failed to act on the Petition in a timely manner.

The back-up treatment is triggered specifically by the "Back-up Transfer Date." See ¶¶ 10.2,

10.3, 10.6, 10.7. The Back-up Transfer Date is the tenth business day after the "Funding

Termination Date." ¶ 2.5. The Funding Termination Date, defined in ¶ 6.7, is the date upon

which the Buyers' (i.e., TDS's) obligation to fund the "Working Capital Loan" expired. The

Working Capital Loan was a "line of credit" to be used by Airadigm for its "ongoing working

capital needs." ¶ 6.6. The Funding Termination Date could be extended at the option of TDS.

See ¶ 6.7.

My prior decision that the back-up transfer date occurred on November 14, 2002 has not

been appealed or superseded. And it still seems to be sound. The request in 2003 for the court to

modify that date because TDS had unilateral control of its fixing was rejected as it should have

been. The argument gains no strength now when it is advanced by TDS.

The 2000 Plan expressly states that the back-up treatment governs if the FCC "fails to act

on the Petition for Reinstatement in a timely manner." ¶ 10.1. "Timely" means January 31,

2001 at the latest—after that date TDS could trigger the Back-up Transfer Date by opting to stop

funding of the "Working Capital Loan." See ¶ 6.7(a). If the FCC refused to rule on the petition

for reinstatement by January 31, 2001, then TDS could trigger the back-up treatment. This is, in

fact, what happened. TDS opted to stop funding the Working Capital Loan. The consequence[3]

of this decision presumably was anticipated by TDS. TDS is now bound by its decision to

trigger the back-up treatment.

TDS and OEDA believed in 2004 that Claim 15 was subject to the back-up treatment.

They behaved in 2004 as if Claim 15 was subject to the back-up treatment. It seems clear that

TDS and OEDA intended the words of the 2000 Plan—including the strict time limits—to

control.[4] The only holding consistent with that intention is that once the back-up transfer date

was passed, OEDA was entitled to no more than $2,000,000.

Thus, Claim 15 was satisfied when TDS paid OEDA $2 million. See 2000 Plan ¶¶ 10.7,

10.2. All that remained to be assigned to TDS under the 2004 Settlement Agreement was blue

sky. OEDA had no further right to payment from Airadigm. Its right to payment was solely

against TDS, and TDS made that payment. TDS cannot now assert a right to payment from

Airadigm which OEDA did not have to assign.

This ruling is not inconsistent with the allowance of Claim 16, the Ericsson Claim.

Claim 16 had been assigned to TDS by Ericsson prior to the 2004 Settlement Agreement[5] and

---

[3] "On the Back-up Transfer Date . . . the Buyers shall pay OEDA $2 million in full satisfaction of its secured Claims." ¶ 10.7. "After the Back-up Transfer Date, no additional payment will be made on account of Claims against the Debtor." ¶ 10.2.

[4] The FCC, the party objecting to Claim 15, was crammed down in the 1999 Bankruptcy Case. Thus, the FCC had no "intent" in the 2000 Plan for the Court to consider.

[5] Notice of Assignment of Claim, In re Airadigm Communications, Inc., Case No. 99-33500 (Docket No. 520 Bankr. W.D. Wis. Apr. 21, 2004).

was in a separate class of claims under the 2000 Plan.[6] Unlike the OEDA claim (now Claim 15)

Claim 16 retained its lien on Airadigm's assets in the 2000 Plan even under the back-up

treatment.[7] At the hearing in which Claim 16 was allowed, it was immaterial (and thus it was not

decided) whether Claim 16 was subject to the primary or backup treatment because Claim 16

retained its secured status in either case.

In contrast, Claim 15 became entirely unsecured after the $2 million payment was

tendered pursuant to ¶ 10.7 of the 2000 Plan. Because ¶ 10.2 of the 2000 Plan provided that

"after the Back-up Transfer Date, no additional payments will be made on account of Claims

against the Debtor," it is material, indeed, determinative, whether Claim 15 is subject to the

primary or the back-up treatment. ¶ 10.2 did not, nor could not have an effect on the lien

securing Claim 16.

Accordingly, the FCC's objection to TDS's Claim 15 is hereby sustained. It may be so

ordered.

Dated:  January 18, 2008

ROBERT D. MARTIN
UNITED STATES BANKRUPCY JUDGE

---

[6] Ericsson's claims were "Class 2 Claims" and OEDA's claims were "Class 3 Claims." 2000
Plan ¶¶ 5.2, 5.3.
[7] Ericsson would retain its lien on the FCC licenses until the $41 million payment was made or
the license auction was held. 2000 Plan ¶ 5.2(b). As discussed above, the license auction will
not take place.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

AIRADIGM COMMUNICATIONS, INC.,                                    (Chapter 11)

                    Debtor.                                       Case No. 06-10930

ORDER DISALLOWING CLAIM 15

The Court having reached the conclusions of law contained in the memorandum decision

filed this date, it is hereby ORDERED that:

1.      The United States' objection to Telephone & Data Systems, Inc.'s Claim 15 is

GRANTED.

2.      Claim 15 of Telephone & Data Systems, Inc. is DISALLOWED.

Dated:  January 18, 2008

ROBERT D. MARTIN
UNITED STATES BANKRUPCY JUDGE